**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

THAD EVERETT DELAUGHTER                                    PLAINTIFF

VERSUS                                    CIVIL ACTION NO. 1:14-cv-18-JCG

RONALD WOODALL, et al.                                    DEFENDANTS

---

**PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

The Plaintiff, Thad Everett Delaughter, submits this Memorandum Brief in Opposition to the Defendants' Motion for Summary Judgment, to-wit:

## I.  INTRODUCTION

The Court is well-familiar with the procedural background of this case. In his Amended Complaint, Thad Everett Delaughter ("Delaughter"), advances two claims: (1) declaratory and prospective injunctive relief due to a violation of federal law (Eighth Amendment) against the Defendants in their official capacities; and (2) damages, pursuant to 42 U.S.C. § 1983, against the Defendants in their individual capacities for their deliberate indifference toward his serious medical needs in violation of the Eighth Amendment.[1]

The Defendants, Michael Hatten ("Hatten") and Gloria Perry, M.D. ("Dr. Perry"), seek summary judgment on Delaughter's first claim arguing they are entitled to Eleventh Amendment

---

[1] Doc. 162.

sovereign immunity.[2] On the second, they invoke qualified immunity.[3] But under the facts of this case, they find no safe harbor in either.

Delaughter's claim for declaratory and prospective injunctive relief falls within the *Ex Parte Young* exception to sovereign immunity. 209 U.S. 123 (1908). And qualified immunity is inappropriate at this stage because the record demonstrates Delaughter successfully states a claim for deliberate indifference, and that the Defendants' conduct was not objectively reasonable in light of clearly established law. At a minimum, there are genuine issues of material fact, and reasonable minds might differ on the inferences to be drawn from any undisputed facts.

"Summary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967). It must be viewed with a skeptical eye. This case needs to be tried. Delaughter prays the Court provide him that opportunity and completely deny the Defendants' Motion for Summary Judgment.

## II.  FACTS

### A.    *The Parties*

In 2006, Delaughter began serving a 25-year prison sentence with the Mississippi Department of Corrections ("MDOC") and has been incarcerated exclusively at facilities operated by MDOC since that time.[4] From the outset, MDOC and its officials have been aware of Delaughter's chronic and fragile physical condition.[5] Delaughter is currently incarcerated at the Mississippi State Penitentiary ("MSP") in Parchman, Mississippi, and prior to December 2015, he

---

[2] Doc. 179, 180.
[3] *Id*.
[4] Exhibit 1 - Delaughter Decl. at ¶ 3.
[5] Exhibit 2 - MDOC Prison Medical History and Screening.

was housed at the South Mississippi Correctional Institution ("SMCI") in Leakesville, Mississippi.[6] His tentative release date is January 16, 2031.[7]

It is undisputed Delaughter has suffered from rheumatoid arthritis nearly his entire life, and that prior to being incarcerated, he received a bilateral hip replacement and a bilateral knee replacement as a result.[8] This condition continues to cause progressive deterioration and pain, and the record is brimming with examples of Delaughter's physical challenges. At age 44, he stands a mere 5 feet tall and weighs approximately 100 pounds.[9]

Hatten has been an MDOC employee since August 2006 and holds the position of Health Services Administrator, which involves "medically related administrative work on the Senior Executive Level, in which he oversees the health care delivery system for those Mississippi Department of Corrections (MDOC) offenders incarcerated in the Southern Region of Mississippi."[10] His duties include, but are not limited to, conducting onsite environmental/health inspections, monitoring compliance with established correctional healthcare standards, responding to constituent complaints/concerns, conducting "mock" audits for compliance with MDOC policy and procedure, assisting with long-range planning, setting measurable long and short-term goals for delivery of healthcare, and quality assurance monitoring as it relates to healthcare.[11] He reports directly to Dr. Perry "via oral and written reports."[12]

---

[6] Exhibit 1 at ¶ 4.
[7] Doc. 179-1 - Inmate Time Sheet.
[8] Doc. 180 at 2.
[9] Exhibit 1 at ¶ 2.
[10] Exhibit 3 – Hatten Answer to Interrogatory No. 8.
[11] *Id.*
[12] *Id.*

Dr. Perry is the Chief Medical Officer of the MDOC Office of Medical Compliance ("OMC"), working out of the MDOC Central Office in Jackson, Mississippi.[13] She and her office review requests from treating physicians at MDOC prison facilities for specialty care for inmates, which includes, but is not limited to, requests for surgery from specialists located out of the prison system.[14] OMC also requests appointments with outside specialists "when applicable."[15]

## B.   *Background*

As early as January 19, 2010, Delaughter began complaining to Hatten and other MDOC medical staff of severe pain in his hips.[16] He described how his artificial left hip was popping and grinding, and that when he would bend over, it felt like it was about to pop out.[17] X-rays taken of his left hip on February 4, 2010 revealed the left prosthetic femoral head was projecting over the top half of the acetabulum component, which was suspicious for dislocation, and also displayed a tilting of the acetabular component.[18]

Delaughter was seen on March 1, 2010, within MDOC, by Daisy M. Thomas, M.D. for an "MDOC Specialty Care Consultation Request" regarding Delaughter's "prob. dislocated left hip prosthesis."[19] After reviewing the x-rays and performing a physical examination, Dr. Thomas approved the consultation request, as did Robert Moore, M.D.[20]

Throughout 2010 and into 2011, while in MDOC custody, Delaughter repeatedly requested sick calls and medical care relating to his hip.[21] For example:

---

[13] Doc. 179-2 – Perry Aff. at ¶ 2.
[14] *Id*. at ¶ 3.
[15] *Id*.
[16] Exhibit 4 - MDOC Sick Call Request Forms and Records *in globo*; Doc. 62 at 9-11.
[17] *Id*.
[18] Exhibit 5 – OneRadiology Medical Records at 1.
[19] Exhibit 6 – MDOC Medical Records Note dated Mar. 1, 2010.
[20] *Id*.
[21] Exhibit 4.

- January 19, 2010: "I need to see Dr. about my left bilateral total hip replacement. I am in severe pain. I am chronic care!"

- January 26, 2010: "Sick Call Request: SEE MD ABOUT HIP REPLACEMENT"

- February 22, 2010: "I have already seen the doctor and had x-rays. My left hip is in severe pain. The pain has spread to my left knee replacement. I haven't seen anyone since I had x-rays done!"

- October 14, 2010: "I need to see a doctor 'Please' I am in severe pain! My left total bilateral hip replacement is out of place."

- October 22, 2010: "I need to see the doctor about my left total bilateral hip replacement. I am in severe pain."

- October 26, 2010: "I need to see a doctor about my left total bilateral hip replacement. I am in severe pain (chronic care)."

- November 12, 2010: "I need to see a doctor, please, My left hip is getting worse. I am in Severe pain. I can't hardly walk!"

- January 21, 2011: "I need to see the doctor about my left hip, and to get my medications refilled."
- February 22, 2011: "I need to see the doctor about my left hip, and to get my medications refilled."

- March 28, 2011: "I need to see the doctor about my rheumatoid arthritis, I am in severe pain with my left hip-replacement and my right hand."

- May 24, 2011: "I need to see the doctor about my left hip. I am chronic care."[22]

During this time, he made numerous requests to SMCI medical staff, and Hatten, for a referral to an outside specialist.[23] X-ray imaging of Delaughter's left hip taken on June 3, 2011 revealed subluxation at the femoral component with pseudoarticulation along the superior aspect of the acetabulum and bony remodeling.[24]

---

[22] *Id.*
[23] *Id.*; Doc. 62 at 9-11.
[24] Exhibit 5 at 4.

C.     *Elliott Nipper, M.D.*

Because SMCI medical staff were numb to his complaints, Delaughter went to Hatten directly and asked to be sent to a specialist.[25] Hatten told Delaughter he (Hatten) would personally take care of it.[26] After complaining for nearly one and one-half (1 ½) years about his hip, Hatten finally arranged for Delaughter to see Elliott Nipper, M.D., an orthopaedic surgeon, who at the time was with Southern Bone and Joint Specialists, P.A. in Hattiesburg, Mississippi.[27]

On July 13, 2011, Delaughter saw Dr. Nipper.[28] X-ray imaging revealed a failure of the acetabular component of the prosthetic left hip as well as debris around the component.[29] Dr. Nipper ordered a pelvic CT Scan and White Blood Cell ("WBC") Scan, which were performed at Forrest General Hospital on or about August 2, 2011.[30] The WBC Scan was negative (for infection), but the pelvic CT Scan confirmed a failure of the acetabular component.[31] Dr. Nipper describes a "failure" of the acetabular component as being radiolucency around the component, consistent with instability, and "radiolucency" as "an area of decreased bone density on an x-ray, which looks like a halo around the prosthetic components," which is often "a sign of wear debris, loosening or component failure."[32]

Delaughter saw Dr. Nipper again on September 20, 2011 for follow-up, a visit Hatten also arranged.[33] During this visit, Dr. Nipper determined Delaughter would need a left hip revision/reconstruction and "discussed with the patient the severity and complexity of the

---

[25] Doc. 62 at 9
[26] *Id.*
[27] *Id.* at 11, 18; Exhibit 7 – Southern Bone & Joint Specialists, P.A. Medical Records at 2.
[28] Exhibit 7 at 2.
[29] *Id.* at 3.
[30] *Id.* at 3-7.
[31] *Id.* at 4-5, 12.
[32] Exhibit 8 – Nipper Dep. 35:7-15; 31:9-16.
[33] Exhibit 7 at 12-13; Doc. 62 at 11.

situation," which, according to Dr. Nipper, means he tried to scare Delaughter "about how bad this was or how bad a reconstruction would be on it."[34] Nevertheless, Delaughter "elected to proceed with operative treatment."[35]

Surgery was scheduled for October 24, 2011 but was cancelled at some point beforehand.[36] A September 20, 2011 order in Delaughter's MDOC medical records says "[h]ave inmate ready for check in at the registration desk located inside the 1st floor parking garage entrance on 28th Avenue at 6:30 10-24-11."[37] But another MDOC medical record note dated October 23, 2011 (the day before the scheduled surgery), shows Dr. Ronald Woodall (the primary doctor at SMCI) instructed SMCI medical staff that the admission date for Delaughter's surgery "was changed to November."[38]

While it is undisputed Dr. Nipper did not perform the surgery on October 24, 2011 (or in November 2011), the reason the surgery was cancelled *is* disputed. Factual questions remain regarding, among other things, who or what entity or agency "[o]bviously, fussed with [Dr. Nipper] about the cost of the custom components," as well as what was done thereafter.[39]

Over the next two years, Delaughter remained incarcerated at SMCI.[40] Yet, no progress was made toward scheduling the surgery. An x-ray of Delaughter's left hip taken on August 9, 2013 showed the femoral component was "slightly high riding and superior to the acetabulum component," which the radiologist found "likely represents chronic dislocation ..."[41] This radiology report notes there were similar findings in the previous study but also described

---

[34] Exhibit 7 at 12-13; Exhibit 8 - Nipper Dep. 35:19-25.
[35] Exhibit 7 at 12-13.
[36] Doc. 62 at 13; Doc. 179-2 Perry Aff. at ¶ 7; Doc. 183-1.
[37] Exhibit 9 – MDOC Medical Record Order dated Sept. 20, 2011.
[38] Exhibit 10 – MDOC Medical Record Note dated Oct. 23, 2011; Doc. 62 at 17.
[39] Exhibit 8 – Nipper Dep 25:05-13.
[40] Exhibit 1 at ¶ 4.
[41] Exhibit 5 at 5.

increased density around the acetabulum, representing new bone formation, severe generalized osteopenia, and a compression fracture of the L5 vertebrae.[42] Delaughter's hip condition was getting worse, and no medical professional disagreed with Dr. Nipper's determination that surgery was medically necessary. *See Delaughter v. Woodall*, 909 F.3d 130, 138 (5th Cir. 2018) ("Dr. Nipper determined in 2011 that Delaughter requires hip replacement and reconstructive surgery. No party points to evidence that any medical professional has disagreed with Dr. Nipper").

On September 5, 2013, nearly two years after the surgery was cancelled, Delaughter saw Dr. Nipper for the final time.[43] During his deposition, however, Dr. Nipper testified that he already referred Delaughter to the University of Mississippi Medical Center ("UMMC") sometime between the September 20, 2011 and September 5, 2013 visits:

Q:     So you didn't see Mr. Delaughter between September 2011 and September of 2013. Is that correct?

A:     No, sir. I believe I had referred him to University after that last visit.

Q:     In 2011?

A:     I made a referral to the orthopedic guys at UMC.

Q:     In 2011?

A:     On the 2013 visit, in the first paragraph, it says I referred him for CT scan and referred – and I tried to refer him to University.

Q:     I'm talking about back in – the ones that are [Bates Stamped] 12 and 13 from September of '11.

A:     Right. But the first one I have in '13 said I had referred him, meaning previously.

Q:     Okay. Previously. Do you know the result of that referral?

A:     No, sir. [44]

---

[42] *Id.*
[43] Exhibit 7 at 14-15.
[44] Exhibit 8 – Nipper Dep. 17:12-18:3 (referring to Exhibit 7 at 14-15).

Dr. Nipper's September 5, 2013 office note reads: "This last visit [September 20, 2011], we discussed his reconstructive options. **I referred him for CT scan and custom component evaluation. His insurance would not provide for that**. I tried to refer him to see if University would be an option if he could have appropriate components."[45] When asked about this during his deposition, Dr. Nipper said:

> Q:   I want to ask you about that [Bates Stamp] No. 14 and that part you just read about you referred him for the custom component evaluation.
>
> A:   Yes, sir.
>
> Q:   It says his insurance would not provide for that. What –
>
> A:   I don't remember.[46]

Dr. Nipper later explained:

> Q:   Now, the September 5th, 2013, visit –
>
> A:   Yeah.
>
> Q:   --under Reasons for Visit, you reference that, "I referred him for a CT scan and custom component evaluation. His insurance would not provide for that." And I was a little confused earlier. I know we were talking about several different things. But you mentioned something about that someone told you that the custom component or the custom component evaluation would cost more than the entire surgery?
>
> A:   I don't – And I would – I would tell you I – what I – my recollection of it would not be reliable or valid.
>
> Q:   Okay.
>
> A:   There was obviously some concern about it. The custom components are ridiculously, notoriously expensive to do a reconstruction like that, so –
>
> Q:   And this was – and when I say "this," I mean Mr. Delaughter's condition and the proposed procedure – was a, admittedly, very complex case. Correct?

---

[45] Exhibit 7 at 14-15 (emphasis our own).
[46] Exhibit 8 – Nipper Dep. 18:19-25.

A:      Yes.[47]

Delaughter, of course, is a prisoner who does not have private or governmental (*e.g.*, Medicare) health insurance.[48] According to Chapter IV of the MDOC Inmate Handbook, "MDOC, through a contractual agreement, provides comprehensive medical, dental, and mental health services to all incarcerated Inmates [*sic*] located at the three major institutions, county regional facilities, community work centers, restitution centers and the Governor's Mansion."[49] Regarding prosthetics, it says: "Prostheses and orthodontic devices will be provided when the health of the inmate would otherwise be adversely affected. This will be determined by the responsible medical staff."[50]

Dr. Perry and "[t]he MDOC Office of Medical Compliance review[ ] requests from treating physicians at the state prison facilities for specialty care for inmates which includes, but is not limited to, requests for surgery from specialists located out of the prison system. The OMC also requests these outside appointments when applicable."[51] According to Dr. Woodall, "the approval and scheduling or outside specialty consultations is the responsibility of the Mississippi Department of Corrections and/or its employees.[52] And the manner in which an outside specialist/provider (*i.e.*, a "free-world" doctor) is paid when rendering specialized treatment to an MDOC inmate housed at SMCI is:

> [B]ased upon information and belief, an outside physician sends in a claim form to MDOC. This claim form is a standard 1500 Health Insurance Claim Form approved by the National Uniform Claim Committee. **MDOC then analyzes what to pay just as an insurance company would do**. Generally, MDOC uses the Medicaid

---

[47] *Id*. at 39:24-40:17.
[48] Exhibit 1 at ¶ 6.
[49] Exhibit 11 - MDOC Handbook, Chapter IV
[50] *Id*.
[51] Doc. 179-2 - Perry Aff. at ¶ 3.
[52] Doc. 79-2 – Woodall Aff. at ¶¶ 7, 22.

payment scale to make this determination. MDOC then enters the claim in the MAGIC system and the billing party is then paid through the MAGIC system.[53] [54]

There is a genuine factual dispute about whether MDOC refused to pay for the custom component evaluation and surgery, as Delaughter alleges.[55] Moreover, a reasonable inference may be drawn that MDOC refused to pay for the custom component evaluation and surgery based upon the MDOC Inmate Handbook saying that MDOC will provide prosthetic devices "when the health of the inmate would otherwise be adversely affected," and Dr. Nipper noting that Delaughter's "insurance would not provide for that."[56] Further, because MDOC analyzes a claim from an outside medical provider just like an insurance company would, Dr. Nipper's note that Delaughter's "insurance would not provide for that" raises the index of concern even higher.[57]

Furthermore, in a letter to Delaughter dated August 14, 2015, Dr. Nipper said, "I understand you are having difficulties with your failing total hip arthroplasty. Unfortunately, with the MDOC, I am unable to do the surgery as the required reconstructive devices cannot be paid for at my facility."[58] When asked about this letter during his deposition, Dr. Nipper recalled:

Q:      Now, looking back at the – This is "Exhibit 4." That's the letter. Oh. You got it.

A:      See (indicating).

Q:      All right. And is this the letter that you sent to Mr. Delaughter?

A:      I guess so.

Q:      Is that your signature there at the –

---

[53] Exhibit 12 – Hatten Answer to Interrogatory No. 14 (emphasis our own).
[54] MAGIC stands for Mississippi's Accountability System for Government Information and Collaboration, the "the statewide accounting and procurement system of record, encompassing Finance (accounting, budgeting, grants management), Logistics (procurement, fleet management, inventory management) and Data Warehouse functionality." https://www.dfa.ms.gov/dfa-offices/mmrs/mmrs-applications/magic/ (last visited Oct. 25, 2019)
[55] Doc. 62 at 8, 12, 15-16; Doc. 162.
[56] *Compare* Exhibit 11 to Exhibit 7 at 14.
[57] *Compare* Exhibit 12 to Exhibit 7 at 14.
[58] Exhibit 13 – Nipper Ltr., Aug. 14, 2015.

A:      Yes, sir.

Q:      --at the bottom of the letter? All right. Now, when you say, "Unfortunately, with the MDOC, I am unable to do the surgery as the required reconstructive devices cannot be paid for at my facility," there was clearly an issue with payment for the custom component evaluation or the custom component. Correct?

A:      Obviously I thought so. I don't remember what it was.

Q:      So you don't really have any recollection as to whether it was –

A:      I can't – I don't remember. So there are common pushbacks that we get when we do something super expensive. Most insurers have some type of cap price for things that they pay for. So a lot of times, the facilities that we work at as orthopedists will push back if I use something that's really, really expensive, if I use a lot of OP-1 or special bone graft or something like that, and sometimes the insurer will push back and say, "No. That's on the patient." I cannot honestly state – Obviously, there was some type of pushback to me, because I felt like there was, but I don't remember.[59]

The Defendants also bring up, for the first time in this nearly 6-year litigation, that Delaughter smoked cigarettes. This is nothing more than a red herring. No doctor has ever referenced smoking as having anything to do with whether Delaughter needs the surgery, or that being a smoker was a bar to his having the surgery.[60] Notably, the Defendants point to no record evidence indicating otherwise. To be sure, Dr. Nipper was aware Delaughter was a smoker when the surgery was scheduled for October 24, 2011.[61]

At the conclusion of the September 5, 2013 visit, Dr. Nipper again referred Delaughter, through MDOC, to UMMC.[62] On October 13, 2013, after Delaughter initiated his claim in the MDOC Administrative Remedy Program, Dr. Woodall filled out a First Step Response Form,

---

[59] Exhibit 8 – Nipper Dep. 41:4-42:7.
[60] Exhibit 1 at ¶ 8.
[61] Exhibit 7 at 2.
[62] *Id*. at 15.

noting that Delaughter had seen Dr. Nipper on September 5, 2013, and per the MDOC Office of

Medical Compliance, had been referred to UMMC for possible reconstructive surgery.[63]

## D.    *Post-Dr. Nipper*

But the delays continued. According to Delaughter's MDOC medical records, a

consultation request to see an outside orthopedist was approved on July 25, 2014.[64] Yet, an MDOC

medical records note dated February 18, 2015 (nearly 7 months later), says the "consult put in in

July to go to UMC was autoapproved [*sic*] but he never went. Will check on this."[65] The note also

says he "needs to be followed by ortho."[66]

Delaughter, however, did not go to UMMC until March 8, 2016, when he was seen by

Adam Ryan Smith, M.D.[67] That visit was over 1 year and 19 days after being seen by SMCI

medical staff on February 18, 2015; 1 year, 7 months, and 12 days after the UMMC orthopedist

consultation was "autoapproved" on July 25, 2014; and **2 years, 6 months, and 3 days after the**

**final visit with Dr. Nipper on September 5, 2013**.[68]

Dr. Smith noted Delaughter's "right hip appears to have severely migrated with extensive

osteolysis in the cement mantle with severe migration" and that:

> The left hip has migrated proximally significantly with a fracture of the poly. It
> appears that the stem has migrated proximally through the fracture and the polys.

---

[63] Exhibit 14 – Dr. Woodall First Step Response Form.
[64] Exhibit 15 – Clear Coverage Authorization Request.
According to McKesson Corporation, "Clear Coverage" is "a robust utilization management, coverage determination and network compliance solution that transforms traditional benefit management by brining clinical and financial decision making to the point of decision" and "enables health plans to more effectively leverage clinical criteria, creating the opportunity for improved coverage determination processes and more appropriate medical spending." McKesson Corporation, Clear Coverage, *Automating Authorization and Coverage Decisions in Real Time* https://bit.ly/2OYYUFZ (last visited Oct. 18, 2019).
[65] Exhibit 16 – MDOC Medical Record dated 2/18/15.
[66] *Id.*
[67] Doc. 183-4.
[68] *Compare* Doc. 183-4 to Exhibit 16, Exhibit 15, and Exhibit 7.

It is causing significant ware. He [Delaughter] has almost no offset and is shortened severely."[69]

These findings are consistent with Dr. Nipper's but also confirm Delaughter's condition had worsened, as evidenced by the presence of the poly fracture.[70] This continued deterioration is unsurprising (and obvious), as Delaughter had been living with a dislocated and failed prosthetic left hip for more than *6 years*.[71] Dr. Smith ordered lab tests to determine whether there was an infection and said Delaughter was to follow-up with him "in 2 weeks' time."[72]

The follow-up appointment was 4 weeks later, on April 5, 2016.[73] Though Delaughter admitted to using marijuana, it is disputed as to when the marijuana use occurred. Exhibit J to the Defendants' Motion references several positive drug tests for marijuana, but the most recent occurred on March 30, 2014, over 2 years *before* the April 5, 2016 visit with Dr. Smith.[74] Notably, however, Dr. Nipper never expressed concern with marijuana use as being a bar to surgery; he only said it may affect healing.[75] Regardless, at the conclusion of the April 5, 2016 visit, Dr. Smith ordered that Delaughter be brought "back in 2 months and will drug test him at that time."[76]

But Delaughter was not brought back to Dr. Smith in 2 months' time. Instead, on January 5, 2017 (9 months later), he was brought to a *different* UMMC doctor, Patrick Peavy, M.D.[77] The Defendants point to no record evidence explaining why Delaughter was not taken back to Dr. Smith in June 2016, as Dr. Smith ordered.[78] A reasonable inference may be drawn that Delaughter

---

[69] Doc. 183-4 at 1.
[70] *Compare* Doc. 183-4 at 1-2 to Exhibit 7.
[71] Compare Doc. 183-4 at 1-2 to Exhibit 5, 6.
[72] Doc. 183-4 at 2.
[73] *Id*. at 6.
[74] Doc. 179-10.
[75] Exhibit 8 – Nipper Dep. 16:12-17:3.
[76] Doc. 183-4 at 6.
[77] *Id*. at 9.
[78] *Id*. at 6.

was not taken back to Dr. Smith in June 2016 because Dr. Smith would have scheduled Delaughter for surgery. Given the previous delays and refusal to pay for the surgery and custom component evaluation, it is reasonable to infer the surgery and custom components (and evaluation) would not have been paid for in June 2016 either.

Curiously, Dr. Peavy's January 5, 2017 office note says Delaughter "is in jail but expects to be released in the next 5 years if all goes as planned."[79] But Delaughter never told Dr. Peavy that he (Delaughter) would be released in the next 5 years.[80] Dr. Peavy's note further says he and Delaughter discussed "the severe complexity of his issues," which would "require a large reconstruction" with "significant intraoperative and postoperative risks."[81] Because of Delaughter's incarceration, Dr. Peavy felt Delaughter would "likely not be able to receive ideal postoperative care or likely any postoperative physical therapy," or be able to schedule an appointment "at the Pavilion with Dr. Stronach."[82] But if specific types of postoperative care were ordered as a result of a surgery, MDOC (and its officials like Hatten and Dr. Perry) would be legally obligated to provide it. *See Lawson v. Dall. Cty.*, 286 F.3d 257, 263 (5th Cir. 2002) (district court did not err in finding deliberate indifference where prison nurses had been instructed to change the plaintiff's dressing three times a day, provide regular medication, a foam mattress, and hydrotherapy, but did none of those things).

Moreover, Delaughter did not consent to waiting until he is released from prison to have the surgery.[83] Simply acknowledging what Dr. Peavy was saying when Dr. Peavy discussed waiting until Delaughter is released from prison in order to "maximize his chances of recovery,"

---

[79] *Id*. at 9.
[80] Exhibit 1 at ¶ 9.
[81] Doc. 183-4 at 9.
[82] *Id*. at 9-10.
[83] Exhibit 1 at ¶ 9.

does not mean Delaughter consented to such an option.[84] Delaughter did not consent to living in agony with a fractured and dislocated artificial left hip for the succeeding 14 years, a condition which long-ago was deemed to require surgery.[85] He wanted the surgery then, just as he wanted it in 2011 and every day since Dr. Nipper first determined he needed surgery.[86] Delaughter has never told anyone – doctor, nurse, prison official, whomever – at any time, that he did not want the surgery or wanted to wait until his release to have it performed.[87] There are genuine factual disputes surrounding the UMMC records, including the 7 month delay caused by not getting Delaughter back to Dr. Smith in June 2016, as Dr. Smith ordered.

On August 28, 2018, Delaughter was seen by Sameer Naranje, M.D., an orthopaedic surgeon at the University of Alabama-Birmingham ("UAB").[88] There, x-rays revealed a significant displacement of the left femoral component with a fracture of the acetabular component.[89] These findings further illustrate the continued deterioration of Delaughter's condition, because the imaging taken previously by Dr. Nipper and Forrest General Hospital did not show a displacement of the left femoral component or a fracture of the left acetabular component.[90] Dr. Naranje determined Delaughter needed surgery, discussed the risks and benefits, and Delaughter elected to proceed with the left hip revision.[91] The surgery was scheduled for October 1, 2018, but on September 25, 2018, it was "cancelled until further notice," without explanation.[92]

---

[84] *Id.*
[85] Doc. 183-4 at 10; Doc. 179-1 (tentative release date is Jan.16, 2031); Exhibit 1 at ¶ 9.
[86] Exhibit 1 at ¶ 9.
[87] *Id.* at ¶ 11.
[88] Exhibit 17 – UAB Medical Records.
[89] *Id.*
[90] *Compare* Exhibit 17 to Exhibit 7.
[91] Exhibit 17.
[92] *Id.*

On May 11, 2019, however, Dr. Naranje responded to a written request for information submitted to him on March 29, 2019 by Delaughter's newly-appointed counsel.[93] In his response, Dr. Naranje says Delaughter's diagnosis is a "failed left total hip arthroplasty and painful right hip arthroplasty."[94] When asked why the October 1, 2018 surgery was cancelled, Dr. Naranje said,

> On reviewing [Delaughter's] previous records x-rays, it was found that [Delaughter] was already planned for surgery at University of Mississippi. Considering very complex nature of his surgery, I recommend he get his surgery done at University of Mississippi a nearby hospital as he may need frequent readmissions and urgent care after surgery due to high risk of complications.[95]

He also says Delaughter needs the surgery, and that his condition is likely to worsen if the surgery is not performed."[96]

Dr. Naranje, however, is incorrect that Delaughter was "already planned for surgery at University of Mississippi."[97] Delaughter was never scheduled for surgery at UMMC.[98] Consequently, Dr. Naranje remains a viable option to perform the surgery, but there is no record evidence the Defendants (or MDOC) contacted him again. As for his other concerns, the Defendants are or should be aware of the teachings of *Lawson*, 286 F.3d 257.

The Defendants take great care to list other orthopedists and clinics MDOC has allegedly contacted. On November 23, 2015, despite Dr. Nipper having referred Delaughter specifically to UMMC, Delaughter was seen at Mitias Orthopaedics in New Albany, Mississippi.[99] There, he was examined by Samuel K. Box, D.O., a doctor of osteopathic medicine (not an orthopedic surgeon), who noted: "left total hip prosthesis is eroded through the scope superiorly. I am concerned that if

---

[93] Exhibit 18 – Letter Questionnaire from Dr. Naranje.
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] Exhibit 1 at ¶ 10.
[99] Doc. 183-2 – Mitias Orthopaedics, PLLC Medical Records.

this is not replaced, the prosthesis will erode into the pelvis."[100] Dr. Box referred Delaughter to Rowland M. Roberson, M.D. with Specialty Orthopedic Group in Tupelo, Mississippi.[101] Delaughter saw Dr. Roberson on January 8, 2016, with Dr. Roberson deciding to refer Delaughter to Dr. Stronach[102] at UMMC because of the belief Delaughter "will need large augments if not a tri-flange for reconstruction of his left hip."[103]

William Porter, M.D. of Vicksburg Clinic, LLC saw Delaughter on February 19, 2019, and noted, the "left hip prosthesis is chronically dislocated with femoral head erosion into pelvis. I recommend he see a revision specialist...."[104] Michael Dulske, M.D. with Capital Orthopedic Specialists in Jackson, Mississippi allegedly planned to refer Delaughter back to UMMC.[105] But Delaughter was informed by Dr. Dulske that he (Dr. Dulske) did not perform hip surgeries.[106]

Per the Defendants, Campbell Clinics Orthopaedics in Memphis, Tennessee; Ochsner Medical Center in New Orleans, Louisiana; Tulane University School of Medicine Department of Orthopedics; and Mississippi Sports Medicine in Jackson, Mississippi declined to see Delaughter either because he is an inmate or because of his age.[107] According to Dr. Perry, Campbell Clinics, Ochsner, and Tulane were contacted in July 2018, though specific dates are not identified.[108] Looking at the timing, a reasonable inference may be drawn that these contacts were made only in response to the Fifth Circuit's Order entered on July 17, 2018, which says "the Mississippi

---

[100] Doc. 183-2

[101] *Id.*

[102] Dr. Stronach is also referenced in Dr. Peavy's January 5, 2017 note, where Dr. Peavy states Delaughter "would also not be able to receive any sort of appointment at the Pavillion with Dr. Stronach given his incarceration." [Doc. 183-4 at 10].

[103] Doc. 183-3.

[104] Doc. 186-6.

[105] Doc 179-2.

[106] Exhibit 1 at ¶ 12.

[107] Doc. 179-2.

[108] *Id.*

Department of Corrections did not announce its intent to obtain this surgery until 2015 and out of state options for performing the surgery have yet to be pursued."[109] Had the Fifth Circuit's Order not been entered, these facilities would never have been called.

## E.   *Continuous Delay*

Over the last 9 years, there has been a recurring record of delay with respect to the care for Delaughter's failed prosthetic left hip. For example:

| Events | Length of Delay |
|---|---|
| 2/4/10: x-ray of left hip suspicious for dislocation – 7/13/2011: initial visit with Dr. Nipper | 1 year, 5 months, 9 days |
| 9/20/2011: follow-up visit with Dr. Nipper - 9/5/2013: final visit with Dr. Nipper | 1 year, 11 months, 16 days |
| 9/5/2013: final visit with Dr. Nipper – 11/23/2015: visit with Mitias Orthopaedics, PLLC | 2 years, 2 months, 18 days |
| 9/5/2013: final visit with Dr. Nipper – 3/8/2016: visit with Dr. Smith at UMMC | 2 years, 6 months, 3 days |
| 7/25/2014: UMMC ortho consult auto-approved – 3/8/2016: visit with Dr. Smith at UMMC | 1 year, 7 months, 12 days |
| 6/2016: unscheduled follow-up visit with Dr. Smith at UMMC – 1/5/2017: visit with Dr. Peavy at UMMC | 7 months |

## III.  ARGUMENT

## A.   *Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In evaluating a motion for summary judgment, the Court must construe 'all facts and inferences in the light most favorable to the non-moving party.'" *Davis v. Ellsberry*, 2016 WL

---

[109] Exhibit 19 – Fifth Circuit Order entered July 17, 2018.

4275787 *2 (S.D. Miss. 2016) (Judge Gargiulo) (quoting *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)).

It is improper for the Court to "resolve factual disputes by weighing on conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980). Summary judgment is also improper where the Court merely believes it unlikely that the non-moving party will prevail at trial. *National Screen Serv. Corp. v. Poster Exchange, Inc*., 305 F.2d 647, 651 (5th Cir. 1962).

"A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant, *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); that is, '[a]n issue is material if its resolution could affect the outcome of the action." *Reyes v. Bridgwater*, 362 Fed.Appx. 403 (5th Cir. 2010) (quoting *Wyatt v. Hunt Plywood Co*., 297 F.3d 405, 409 (5th Cir. 2002)). But, even if there is no factual dispute, summary judgment is improper "if the parties disagree regarding the material factual inferences that properly may be drawn from these facts." *Winters v. Highlands Insurance Company*, 569 F.2d 297, 299 (5th Cir. 1978).

**B.**     ***Eighth Amendment Standard***

Under the Eighth Amendment, prison officials must provide prisoners with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when the official's conduct "demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (per curiam) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

Delay in medical care can constitute an Eighth Amendment violation "if there has been deliberate indifference [that] results in substantial harm." *Easter*, 467 F.3d at 463 (quoting

*Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)). "Deliberate indifference lies midway on the continuum between simple negligence and intentional conduct; a prison official shows deliberate indifference if 'the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' An official's knowledge of a substantial risk of serious harm may be inferred if the risk is obvious." *Thibodeaux v. Thomas*, 548 Fed.Appx. 174, 175 (5th Cir. 2013) (per curiam) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Delaughter indisputably suffers from an objectively serious medical condition. *See Gobert v. Caldwell*, 463 F.3d 339, 345 n. 12 (5th Cir. 2006) ("A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."). Dr. Nipper recommended surgery in September 2011, and even a non-medical professional should recognize surgery is required for a dislocated and broken hip.

## C.    *Sovereign Immunity*

The Defendants appear confused about Delaughter's claims against them in their official capacities and the relief he is requesting. They argue, correctly, they are immune from monetary (compensatory) damages on Delaughter's claims against them in their official capacities. But Delaughter does not advance a claim for monetary damages against them in their official capacities. His "official capacity" claim is for declaratory and prospective injunctive relief, and "[t]he Eleventh Amendment does not bar suits for injunctive relief." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, n. 10 (1989).

1.    **Delaughter's claims for prospective injunctive relief fall within the *Ex Parte Young* exception to sovereign immunity.**

"The Eleventh Amendment does not protect state officials from claims for prospective injunctive relief when it is alleged that the state officials acted in violation of federal law." *Delaughter v. Woodall*, 909 F.3d 130, 137 (5th Cir. 2018) (citations omitted). In *Ex parte Young*, the Supreme Court recognized an exception to Eleventh Amendment immunity, which consequently allows for a state official to be sued in his or her official capacity for prospective injunctive relief. 209 U.S. at 159-60. "This exception strips the individual state actor of immunity and allows a private citizen to sue that individual in federal court for prospective injunctive relief based on allegations that the actor violated federal law." *McKinley v. Abbott*, 643 F.3d 403, 406 (5th Cir. 2011). "In *Aguilar v. Texas Dep't of Crim. Justice*, 160 F.3d 1052 (5th Cir. 1998), the Fifth Circuit summarized the Eleventh Amendment immunity exception carved out by the United States Supreme Court in *Ex Parte Young*, 209 U.S. 123 (1908), as follows:

> [t]o meet the *Ex Parte Young* exception, a plaintiff's suit alleging a violation of federal law must be brought against individual persons in their official capacities as agents of the state, and the relief sought must be declaratory or injunctive in nature and prospective in effect. *See Saltz v. Tennessee Dep't of Employment Sec.*, 976 F.2d 966, 968 (5th Cir. 1992)."

*Saucier v. Mississippi Dept. of Corrections*, 2013 WL 4678457 *4 (S.D. Miss. Aug. 30, 2013) (Judge Ozerden) (quoting *Aguilar*, 160 F.3d at 1054).

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Delaughter*, 909 F.3d at 137 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alterations in original) (other citations omitted)).

Delaughter's Amended Complaint alleges an ongoing violation of the Eighth Amendment and seeks declaratory and prospective injunctive relief. He maintains the Defendants violated and continue to violate his Eighth Amendment rights by failing to provide the required hip surgery and requests "an order compelling Defendants and their successors to timely and immediately obtain, arrange, and/or provide him with the prescribed hip replacement and reconstructive surgery along with all necessary post-surgical medical treatment, care, and rehabilitation services, including access to competent outside medical specialists ...."[110] A straightforward inquiry plainly reveals the *Ex Parte Young* exception applies. The Defendants are not entitled to sovereign immunity. And as explained throughout this Memorandum Brief, Delaughter meets his summary judgment burden on the issue of deliberate indifference. At the very least, he has shown there are factual issues requiring a trial.

To use the *Ex Parte Young* exception, "a plaintiff must demonstrate that the state officer has 'some connection' with the enforcement of the disputed act." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (quoting *Ex Parte Young*, 209 U.S. at 157). "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Id*.

For the Defendants to argue they do not have "some connection" with providing adequate medical care to Delaughter is absurd. Dr. Perry is the Chief Medical Officer of the MDOC OMC, and she and her office "review[ ] requests from treating physicians at the state prison facilities for specialty care for inmates which includes, but is not limited to, **requests for surgery from specialists located out of the prison system. The OMC also requests these outside**

---

[110] Doc. 162.

**appointments when applicable**."[111] Dr. Perry not only has "some connection," she *is* the connection.

The Defendants' contention they are not amenable to suit under 42 U.S.C. § 1983 regarding Delaughter's declaratory and prospective injunctive relief claims likewise has no merit. It is well-settled that a state official may be sued in his or her official capacity for prospective injunctive relief under Section 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. 159, 167, n. 14 (1985) (citing *Ex Parte Young*, 209 U.S. at 159-60)).[112]

### 2. The Defendants and their successors should be ordered to continue seeking a specialist to perform Delaughter's surgery.

There is no dispute Delaughter needs surgery. Notably, while the Defendants focus much of their Brief on their reaching out to orthopedic offices about Delaughter, none of that occurred, with the exception of Dr. Nipper, until well after Delaughter filed suit on January 15, 2014.[113] But even then, it was not until November 23, 2015 (nearly 23 months later) that Delaughter was seen at Mitias Orthopedics, PLLC.[114] The Defendants' actions in this regard are tantamount to a concession Delaughter is entitled to prospective injunctive relief.

Delaughter is in MDOC "custody" and will be for the next 12 years.[115] Merriam-Webster dictionary defines "custody" as: "immediate charge and control (as over a ward or a suspect) exercised by a person or an authority."[116] As a prisoner, Delaughter cannot contact outside

---

[111] Doc. 179-2 - Perry Aff. at ¶¶ 2-3 (emphasis our own).

[112] The Fifth Circuit has also explained that "[i]n appropriate circumstances, attorney's fees ancillary to the award of prospective injunctive relief may also be awarded, even where the fees are ultimately to be paid from state coffers." *Harris v. Angelina County, Tex.*, 31 F.3d 331, 338, n. 8 (5th Cir. 1994) (other citations omitted).

[113] At least 9 of the doctor's offices were allegedly contacted after Delaughter was appointed counsel.

[114] *Compare* Doc. 1 to Doc. 183-2.

[115] Doc. 179-1.

[116] https://www.merriam-webster.com/dictionary/custody (last visited Oct. 22, 2019).

specialists or schedule appointments.[117] That is the Defendants' duty – a duty they have systematically breached for nearly a decade.

Confusingly, the Defendants say in their Brief that UMMC has refused to give Delaughter an appointment and "currently has a policy that they will not see inmates as patients unless it is determined by them that the inmate's condition requires UMMC to provide care because no other medical provider in the state has the capability to provide the care. UMMC refers to this as 'uniqueness of care.'"[118] But later in their Brief, the Defendants contend "it is unclear as to what injunctive relief could be ordered as to the Defendants, given the unwillingness of surgeons to perform a hip operation on Plaintiff, which would provide any relief to Plaintiff."[119] This argument defies logic. If the former is true, then the latter cannot be true. But if the latter is true, then the former cannot.

Considering the record evidence of delay, and the fact that Delaughter still needs the surgery after enduring nearly 10 years of excruciating pain with a deteriorating condition, the Court should use its inherent equitable power and order the relief requested in Count One of the Amended Complaint.

## D.   *Qualified Immunity*

State officials are only entitled to qualified immunity from civil liability if their actions were objectively reasonable in the light of clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982). The Defendants are entitled to qualified immunity only if, viewing the evidence in the light most favorable to Delaughter and drawing the reasonable inferences therefrom in his favor, Delaughter fails to demonstrate "(1) that [Hatten and/or Perry] violated a statutory or

---

[117] Exhibit 1 at ¶ 7.
[118] Doc. 180 at 12 (citing Doc. 179-2 at ¶ 20).
[119] *Id*. at 19.

constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Delaughter v. Woodall*, 909 F.3d 130, 137-38 (5th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

But "[t]o negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof,' but must offer more than 'mere allegations.'" *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991)). Where there are disputed material facts – and in this case there are many - "summary judgment is inappropriate unless plaintiff's version of the violations does not implicate clearly established law." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 739 (5th Cir. 2000).

### 1. Delaughter adequately alleges and the record evidence reflects an Eighth Amendment violation.

 "[D]elay in medical care constitutes deliberate indifference in violation of the Eighth Amendment if a prison official disregards a substantial risk of serious harm by failing to take reasonable measures to abate it, and the delay results in substantial harm." *Delaughter*, 909 F.3d at 138 (citing *Mendoza*, 989 F.2d at 195). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (citations omitted). But those instances are not implicated here. *See Delaughter*, 909 F.3d at 138 ("[W]e have previously found that claims like Delaughter's do not constitute 'mere disagreement with one's medical treatment.'"). (citations omitted).

"A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious

medical needs." *Blackstock v. Corrections Corp. of America*, 660 F.Supp.2d 764, 769-70 (W.D. La. 2009) (citing *Easter*, 467 F.3d at 464). Here, the record demonstrates that the Defendants:

- Refused to provide/procure, authorize, and pay for the required surgery and related custom component evaluation;

- Ignored the orders of Delaughter's physicians regarding follow-up appointments;

- Repeatedly ignored and delayed acting on physician referrals;

- Repeatedly ignored Delaughter's complaints for extended periods time, often covering years; and

- Engaged in conduct, when viewed in totality, displaying an outright disregard for Delaughter's serious medical needs.

**2.    The Defendants' conduct was not objectively reasonable in light of clearly established law.**

The Fifth Circuit has divided the second prong into two separate analyses: *first*, whether the alleged violated constitutional rights were clearly established at the time; and *second*, if so, whether the conduct was "objectively unreasonable in light of then clearly established law." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). "Clearly established" requires that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but that does not mean "the very action in question has previously been held unlawful." *Noyola v. Tex. Dept. of Human Resources*, 846 F.2d 1021, 1025 (5th Cir. 1988). Instead, "in the light of preexisting law the unlawfulness must be apparent." *Id*.

**a.    *The violation of Delaughter's constitutional rights was clearly established*.**

A delay in medical treatment "may constitute an Eighth Amendment violation if a prison official's deliberate indifference results in substantial harm, including suffering during the period

of delay." *Thibodeaux*, 548 Fed.Appx. at 175 (citing *Easter*, 467 F.3d at 464-65). Here, the Fifth

Circuit has already decided "that Hatten had fair warning that an unjustified delay in surgery is

unconstitutional." *Delaughter*, 909 F.3d at 140.

"The law of the case doctrine provides that a decision of a factual or legal issue by an

appellate court establishes the law of the case and must be followed in all subsequent proceedings

in the same case in the trial court ...." *Lyons v. Fisher*, 888 F.2d 1071, 1074 (5th Cir. 1989) (internal

quotation omitted); *see also Knotts v. United States*, 893 F.2d 758, 761 (5th Cir. 1990) ("[T]he

[law of the case] doctrine encompasses issues decided by '*necessary* implication' as well as those

decided explicitly") (emphasis in original). Specifically, the Fifth Circuit decided that:

> [I]t is clearly established that delaying medical care can constitute an Eighth
> Amendment violation if the prison official "knows that [the] inmate[ ] face[s] a
> substantial risk of serious harm and disregards that risk by failing to take reasonable
> measures to abate it," and the delay results in substantial harm. *Mendoza*, 989 F.2d
> at 195. This precedent, combined with the cases cited above, which specifically
> address delays of surgical procedures, constitutes a combination of precedential
> authority and a robust consensus of unpublished authority, and convinces us that
> Hatten had fair warning that an unjustified delay in surgery is unconstitutional.
> Therefore, if the fact issues under prong one were resolved in Delaughter's favor,
> Hatten's conduct would violate clearly established law and he would not be entitled
> to qualified immunity.

*Delaughter*, 909 F.3d at 140 (other internal citations omitted).[120]

The same applies to Dr. Perry, Hatten's direct supervisor.[121] Her job as the MDOC Chief

Medical Officer is to "review requests from treating physicians at the state prison facilities for

specialty care for inmates which includes, but is not limited to, requests for surgery from specialists

located out of the prison system," while she and her office "also request these outside appointments

---

[120] The "cases cited above" referenced by the Fifth Circuit are *Rhett v. Scott*, 145 F.3d 360 (5th Cir. 1998); *Rodriguez v. Woods*, 177 F.3d 978 (5th Cir. 1999); and *Miles v. Rich*, 576 F.App'x 394 (5th Cir. 2014).
[121] Exhibit 3.

28

when applicable."[122] She too "had fair warning that an unjustified delay in surgery is unconstitutional." *Delaughter*, 909 F.3d at 140.

### b. *The Defendants' conduct was not objectively reasonable*.

The Defendants' conduct is in line with allegations made in other prisoner Section 1983 cases involving claims of deliberate indifference where summary judgment or dismissal was inappropriate. For example, in *Rhett*, the plaintiff "alleged an arguable Eighth Amendment claim concerning the 14-month delay in repairing or replacing his knee brace." 145 F.3d at 360.

In *Thibodeaux*, the plaintiff's claim was based upon a multi-year delay in extracting his broken wisdom tooth. 548 Fed.Appx. 174. A prison dentist diagnosed the problem in October 2010 and attempted but failed to extract the tooth in November 2010. *Id*. The plaintiff finally underwent surgery in September 2012, nearly two years after diagnosis. *Id*. In an opinion handed down on December 5, 2013, the Fifth Circuit held that, accepting the plaintiff's allegations as true, "we conclude that the prison officials were well aware of a serious risk to Thibodeaux's health, including his prolonged suffering, and acted with deliberate indifference to that risk by delaying his treatment for almost two years." *Id*.; *see also Reed v. Cameron*, 380 Fed.Appx. 160 (3d Cir. 2010) (prisoner successfully stated claim for deliberate indifference where prisoner "claims that he was approved for surgery to correct a herniated disc in his back over two years ago, but for unknown reasons never received the surgery.").

In *Rodriguez*, the plaintiff brought his Section 1983 claim against various prison personnel in their individual capacities based on the failure to provide treatment for a degenerative joint disease in his left knee. 177 F.3d at 978. After the diagnosis, the prison's health services administration made two requests to have the plaintiff transferred to a medical facility, each of

---

[122] Doc. 179-2.

which was denied. *Id*. The Fifth Circuit reversed the district court's grant of summary judgment, finding "[t]he record does not indicate why Rodriguez never received any further treatment," and that "there is a genuine issue of material fact as to whether prison officials were deliberately indifferent to the condition of his left knee" after the diagnosis. *Id*. If the facts in *Rodriguez* were enough to survive summary judgment, then under the facts here, it should not be a close call. After (and even before) Dr. Nipper's September 2011 determination that Delaughter needs surgery, there have been recurring multi-year delays in having Delaughter seen by an orthopedic surgeon. And, 8 years later, he still has not had the surgery!

In *Miles*, denial of qualified immunity at the summary judgment stage was affirmed on appeal. 576 F.App'x 394. There, the record established the prisoner began experiencing knee problems while incarcerated, "[a]n orthopedic doctor subsequently told him he needed knee replacement surgery," and "despite his repeated requests the surgery and adequate treatment and medication have been denied or delayed." *Id*. at 396. *Miles*, decided on July 31, 2014, illustrates clearly established law with respect to the delays in Delaughter's surgery that occurred after the date of the opinion. *Delaughter*, 909 F.3d at 140, n. 10. Even still, we have:

| Events | Length of Delay |
|---|---|
| 7/31/2014: date of *Miles* opinion – <br> 11/23/2015: visit with Mitias Orthopaedics, PLLC | 1 year, 3 months, 23 days |
| 7/31/2014: date of *Miles* opinion - <br> 3/8/2016: initial visit with Dr. Smith at UMMC | 1 year, 7 months, 8 days |

Notwithstanding *Miles*, on February 4, 2010, the Defendants were aware Delaughter had a dislocated left hip,[123] and as early as September 20, 2011, that Delaughter required surgery.[124] Yet, after the surgery was cancelled, the reason for which is disputed, they did nothing to have it

---

[123] Exhibit 5 at 1
[124] Exhibit 7.

rescheduled or have Delaughter seen by an orthopedic specialist until two years later (September 5, 2013).[125] Then, after Dr. Nipper referred Delaughter to UMMC on September 5, 2013, at the very latest, the UMMC consult was not "autoapproved" until nearly one (1) year later (July 25, 2014);[126] was not noticed by anyone until nearly one and one-half (1 ½) years later (February 18, 2015);[127] and Delaughter was not actually seen by anyone at UMMC until two and one-half (2 ½) years later (March 8, 2016).[128] There are separate and recurring multi-year periods when nothing was done to obtain the surgery, a surgery the Defendants were keenly aware Delaughter needed and had been prescribed. *See Lawson*, 286 F.3d at 263.

The evidence here is far more extensive than in similar cases. Accordingly, viewing the evidence in the light most favorable to Delaughter, the Defendants' conduct cannot be perceived as objectively reasonable, and no reasonable official in their shoes could have believed otherwise.

## IV.  CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment should be completely denied.

**RESPECTFULLY SUBMITTED**, this the 28th day of October, 2019.

**THAD EVERETT DELAUGHTER, PLAINTIFF**

By:     /s/ Christopher Smith
        CHRISTOPHER SMITH

---

[125] *Id.*
[126] Exhibit 15.
[127] Exhibit 16.
[128] Doc. 183-4.

<u>**CERTIFICATE OF SERVICE**</u>

I, Christopher Smith, of the law firm Smith & Holder, PLLC, do hereby certify that I have this day filed the foregoing *Plaintiff's Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment* with the Clerk of Court using the ECF system, which served a copy on all counsel of record.

SO CERTIFIED, this the 28th day of October, 2019.

/s/ Christopher Smith<br>
CHRISTOPHER SMITH

Christopher Smith (MSB# 104366)
SMITH & HOLDER, PLLC
2209 23rd Avenue
Post Office Box 1149
Gulfport, MS 39502-1149
Telephone: (228) 206-7076
Facsimile: (228) 284-1870
Email: chris@smithholder.com