**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**THAD EVERETT DELAUGHTER**                                    **PLAINTIFF**

**v.**                                              **Civil No. 1:14-cv-18-RHWR**

**MICHAEL HATTEN,**
**GLORIA PERRY, and**
**DONALD FAUCETT**                                         **DEFENDANTS**

---

**MEMORANDUM OPINION AND ORDER DENYING THE RENEWED**
**MOTION [244] FOR JUDGMENT AS A MATTER OF LAW OR, IN THE**
**ALTERNATIVE, A NEW TRIAL OR REMITTITUR AND DENYING THE**
**MOTION [246] TO ALTER OR AMEND JUDGMENT**

BEFORE THE COURT is the Renewed Motion [244] for Judgment as a Matter

of Law or, in the Alternative, a New Trial or Remittitur, filed by Defendant Gloria

Perry. Also before the Court is the Motion [246] to Alter or Amend Judgment filed by

Defendant Donald Faucett. Both Motions have been fully briefed. Having considered

the parties' submissions, the record in this case, and relevant legal authority, the

Court finds that both Motions should be denied.

## I. BACKGROUND

**A.      Factual Background**

Plaintiff Thad Everett Delaughter ("Plaintiff") has been incarcerated by the

Mississippi Department of Corrections ("MDOC") since 2006. Trial Tr. [237] at 8-9.

He has suffered from rheumatoid arthritis since early childhood. *Id*. at 8. And in 1992,

at the age of seventeen, Plaintiff had a bilateral hip replacement. *Id*. Plaintiff also

had both knees replaced in the early 2000s, prior to his incarceration. *Id*. at 9.

In January 2010, Plaintiff began submitting numerous sick call requests to prison officials regarding pain in his left hip. *Id*; *see also* Pl.'s Ex. 15, at 2-12. On July 13, 2011, Plaintiff saw Dr. Elliott Nipper ("Dr. Nipper"), an outside orthopedic specialist, regarding that pain. Joint Ex. 1, at 4. Dr. Nipper determined that the acetabular component in Plaintiff's left hip had failed and noticed the presence of debris in the hip. *Id*. Following a series of scans, Plaintiff returned to Dr. Nipper on September 20, 2011, and elected to proceed with surgery *Id*. at 13-14. Dr. Nipper advised Plaintiff that the surgery would require "complex reconstructive components, most probably a custom acetabular component." *Id*. The surgery, scheduled for October 24, 2011, Joint Ex. 3, at 2, was subsequently canceled without explanation and never rescheduled, Trial Tr. [236] at 88.

Plaintiff did not see an orthopedic specialist again until he returned to Dr. Nipper on September 5, 2013. *Id*. at 90; Joint Ex. 1, at 15. Following the initial visit, Dr. Nipper had attempted to refer Plaintiff for a custom component evaluation, but his "insurance" would not cover it. Joint Ex. 1, at 15. Therefore, Dr. Nipper represents that he attempted to refer Plaintiff to the University of Mississippi Medical Center ("UMMC"). *Id*. In a letter years later, Dr. Nipper would inform Plaintiff that "[u]nfortunately, with the MDOC, I am unable to do the surgery as the required reconstructive devices cannot be paid for at my facility." Pl.'s Ex. 9, at 2. In a September 2019 deposition, Dr. Nipper would testify that "somebody had fussed" about the cost of the custom components, but that he could not accurately recall who. Def.s' Ex. 10, at 25-27

According to MDOC records, Dr. Nipper's referral of Plaintiff to UMMC was approved in July 2014, Pl.'s Ex. 7-B, at 2, but he did not see a UMMC doctor until March 2016, Joint Ex. 6, at 2. Instead, on November 23, 2015, Plaintiff saw Dr. Samuel Box ("Dr. Box") of Mitias Orthopedics in New Albany, Mississippi. Joint Ex. 4, at 2-3. Dr. Box referred Plaintiff to Dr. Roland Roberson ("Dr. Roberson") of Specialty Ortho Group in Tupelo, Mississippi. *Id*. at 4. Dr. Roberson saw Plaintiff on January 8, 2016, and referred him to UMMC. Joint Ex. 5, at 4.

On March 8, 2016, Plaintiff saw Dr. Adam Ryan Smith ("Dr. Smith") at UMMC. Joint Ex. 6, at 2. Dr. Smith noted that Plaintiff's left hip "has migrated proximally significantly with a fracture of the poly," that "the stem has migrated proximally through the fracture and the polys," and that "it is causing significant wear." *Id*. Dr. Smith also noted severe migration in the right hip. *Id*. Dr. Smith ordered a series of tests and directed Plaintiff to return in two weeks for a follow-up. *Id*. at 3. Plaintiff returned on April 5, 2016; however, because he admitted to recently using nicotine and marijuana, Dr. Smith directed him to return in two months to undergo a drug test, before scheduling the surgery. *Id*. at 7. Plaintiff did not return to Dr. Smith. Trial Tr. [236] at 99.

Instead, Plaintiff saw Dr. Patrick Peavey ("Dr. Peavy") at UMMC on January 5, 2017. Joint Ex. 6, at 10. Dr. Peavy indicated that because Plaintiff was set to be released in the next five years, the surgery should wait until then. *Id*. at 10-11. However, the parties agreed to the inaccuracy of Dr. Peavy's notes. Plaintiff did not see any other orthopedic specialists in 2017. Trial Tr. [236] at 105-06.

Perry testified that in July 2018, she contacted Campbell Clinic in Memphis, Tennessee, Oschner's Clinic, and Tulane University School of Medicine Department of Orthopedics in New Orleans, Louisiana. *Id.* at 108-09. All three allegedly declined to provide Plaintiff an appointment. *Id*; Def.s' Ex. 1, at 3. Perry also testified that she continued to attempt to contact UMMC throughout the remainder of 2018. Trial Tr. [236] at 108-09. On August 28, 2018, Plaintiff saw Dr. Sameer Naranje ("Dr. Naranje") at the University of Alabama Birmingham. Joint Ex. 7, at 2-4. Dr. Naraje scheduled the surgery for October 1, 2018, but subsequently canceled it due to his belief that UMMC was already planning to perform the surgery. *Id.* at 7-8. Perry would write Dr. Naranje sixteen months later, in February 2020, asking him to reconsider. Def.s' Ex. 9, at 2.

In February 2019, Plaintiff saw Dr. William Porter in Vicksburg, Mississippi, who referred him to a revision specialist. Def.s' Ex. 1, at 2-3. In June 2019, Plaintiff allegedly saw Dr. Michael Dulske with Capital Orthopedics in Jackson, Mississippi, who referred him to UMMC. Def.s' Ex. 4, at 4. Perry testified that during the remainder of 2019, she attempted to obtain appointments with various outside specialists, including Mississippi Sports Medicine in Jackson, Mississippi; Bienville Orthopedic Specialists on the Mississippi gulf coast; Dr. Michael Chamblee in Meridian, Mississippi, Dr. Niels Linschoten of Baton Rouge Orthopedic Clinic in Baton Rouge, Louisiana, and Dr. Al Mollabashy in Dallas, Texas. Trial Tr. [236] at 110-12. As well as Dr. Nipper who by then had moved from Southern Bone & Joint to

North Louisiana Orthopedic & Sports Medicine. *Id*. Each allegedly declined to see Plaintiff. *Id*.

On January 31, 2020, Perry wrote a letter to Dr. Benjamin Stronach at UMMC seeking an appointment for Plaintiff. Def.s' Ex. 4, at 2. Perry retired as Chief Medical Officer on September 30, 2020. Trial Tr. [236] at 34. Dr. Donald Faucett succeeded her in that position. The records in evidence do not indicate that any other attempts were made to contact an outside specialist during 2020. At a pretrial status conference, defense counsel informed the Court that Plaintiff had been seen by orthopedic specialist at UMMC on September 10, 2021, who determined that surgery remained necessary. As of the date of trial, no surgery had occurred.

## B.  Procedural History

On January 15, 2014, Plaintiff, proceeding pro se and *in forma papueris*, filed suit under 28 U.S.C. § 1983 against Defendants Ronald Woodall, Michael Hatten, Wexford Health, Christopher Epps, and Johnny Denmark. Compl. [1] at 1. Plaintiff later added as a Defendant the State of Mississippi. Order [11] at 1. Plaintiff alleged that Defendants had refused to pay for medically necessary hip surgery. Compl. [1] at 4.

Plaintiff voluntarily dismissed Defendants Denmark, Epps, and Wexford Health, Mot. to Dismiss [38][86]; Order [46]; Text Only Order 5/8/15; leaving as Defendants Woodall, Hatten, and the State of Mississippi. The remaining Defendants filed motions for summary judgment, which United States Magistrate Judge John C.

Gargiulo granted.[1] Mem. Op. & Order [123]; [124]. Plaintiff appealed the dismissal of his individual and official capacity claims against Hatten and Woodall but did not appeal the dismissal of his claims against the State of Mississippi. Not. of Appeal [129].

The United States Court of Appeals for the Fifth Circuit affirmed the grant of summary judgment to Woodall and reversed the grant of summary judgment to Hatten. *Delaughter v. Woodall*, 909 F.3d 130, 136-137 (5th Cir. 2018). With respect to the official capacity claims against Hatten, the Fifth Circuit held that the *Ex parte Young* exception to sovereign immunity applied and directed the court to consider the propriety of equitable relief on remand. *Id*. at 137. As to the individual capacity claims against Hatten, the Fifth Circuit held that "if the fact issues under prong one [of the qualified immunity analysis] were resolved in [Plaintiff's] favor, Hatten's conduct would violate clearly established law and he would not be entitled to qualified immunity." *Id*. at 140. Accordingly, the Fifth Circuit remanded that claim for resolution of the factual issues regarding the reason for the delay. *Id*. The Fifth Circuit also directed the court to reconsider appointing counsel to Delaughter. *Id*. at 140-41.

On remand, Judge Gargiulo appointed Christopher Smith of the law firm Smith & Holder, PLLC, as pro bono counsel.[2] Order [156]. Following that appointment, Plaintiff filed an Amended Complaint naming Hatten and Dr. Gloria

---

[1] The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Consent [63] at 1.
[2] Mr. Smith's law partner, G. Morgan Holder, later entered an appearance and participated in this matter. Not. of Appearance [197].

Perry, then the MDOC's Chief Medical Officer, as Defendants. Am. Compl. [162] at 1. Plaintiff advanced two claims under § 1983 for a violation of his Eighth Amendment rights: (1) equitable claim for declaratory and prospective injunctive relief against Defendants in their official capacities; and (2) legal claim for damages against Defendants in their individual capacities. *Id*. at 7-9. Plaintiff again alleged that Defendants were denying him medically necessary hip replacement surgery and post-operative treatment. *Id*. at 6-7.

Defendants subsequently filed a joint motion for summary judgment asserting sovereign and qualified immunity, Mot. for Summ. J. [179], which Judge Gargiulo denied, Order [206]. Judge Gargiulo held that because the *Ex parte Young* exception applied, Defendants were not entitled to sovereign immunity on the official capacity claims against them. *Id*. at 7-9. Judge Gargiulo further held that because the factual disputes regarding the reason for the delay, identified by the Fifth Circuit, still existed, Defendants were likewise not entitled to qualified immunity on the individual capacity claims against them. *Id*. at 9-11. On October 1, 2021, this case was reassigned to United States Magistrate Judge Robert H. Walker. Order [215].

## C.    Trial and Post-trial Proceedings

Plaintiff's claims were tried before a jury on December 14-15, 2021. Final J. [241] at 1. At the close of Plaintiff's case-in-chief, Defendants moved for Judgment on Partial Findings under Federal Rule of Civil Procedure 54(c) as to Plaintiff's equitable claims and Judgment as a Matter of Law under Rule 50(a) as to Plaintiff's damages claims. Trial Tr. [237] at 59. The Court held over the Rule 54(c) Motion regarding

Plaintiff's equitable claims and denied the Rule 50(a) Motion regarding Plaintiff's damages claims. *Id*. Defendants reasserted both motions at the close of the entire case. *Id*. at 69-70. Following argument by counsel, the Court reiterated that it would decide the former request following trial and again denied the latter request. *Id*. at 77. Defendants also objected to the denial of their request to include jury instructions on qualified immunity and respondeat superior. *Id*. at 78-82.

The jury returned a unanimous verdict in Plaintiff's favor on his individual capacity claim against Perry, but not Hatten, and awarded him $382,000.00 in compensatory damages. Jury Verdict [230] at 1-2; Final J. [241] at 1. At the conclusion of trial, the Court directed the parties to submit proposed finding of fact and conclusions of law regarding Plaintiff's pending injunctive relief claim. Order [232]. After receiving and considering those submissions, the Court granted Plaintiff's request for prospective injunctive relief.[3]

Defendant Dr. Gloria Perry ("Perry") has filed a Renewed Motion [244] for Judgment as a Matter of Law or, in the alternative, a New Trial or Remittitur. Mot. [244]. Perry contends that she is entitled to judgment as a matter of law because "the jury lacked a legally sufficient evidentiary basis to find for the Plaintiff and award him damages." Mem. [245] at 5. Alternatively, Perry argues that the Court should grant a new trial or remit the jury's compensatory damages award to nominal

---

[3] Upon being informed of Dr. Donald Faucett's succession of Dr. Gloria Perry as the Chief Medical Officer, the Court automatically substituted Faucett as the official capacity defendant, pursuant to Federal Rule of Civil Procedure 25(d). Text Only Order 12/21/21.

damages or an amount not to exceed $250,000.00 *Id*. at 20. Plaintiff has filed a Response [258] and Perry a Reply [268].

Defendant Dr. Donald Faucett has filed a Motion [246] to Alter or Amend Judgment. Faucett contends that the Court should alter, amend, or vacate its order granting prospective injunctive relief because new evidence renders Plaintiff's claim moot and the Court committed two clear errors of law. Mem. [247] at 3. Plaintiff has filed a Response [260] and Faucett a Reply [267].

## II.   RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL OR REMITTITUR

Perry filed a Renewed Motion [244] for Judgment as a Matter of Law or, in the alternative, a New Trial or Remittitur. Mot. [244]. First, Perry contends that she is entitled to judgment as a matter of law because "the jury lacked a legally sufficient evidentiary basis to find for the Plaintiff and award him damages." Mem. [245] at 5. Second, Perry contends that she is entitled to a new trial because the jury's verdict is against the weight of evidence and the Court erred by not giving two jury instructions she requested. *Id*. at 20. Finally, Perry contends that the Court should remit the jury's compensatory damages award to nominal damages or an amount not to exceed $250,000.00 *Id*. at 23-28. The Motion has been fully briefed. For the reasons that follow, the Court will deny the Motion.

## A.   Renewed Motion for Judgment as a Matter of Law

### a.   Applicable Legal Standards

Federal Rule of Civil Procedure 50(b) permits a party, within 28 days after the entry of judgment, to file a renewed motion for judgment as a matter of law. Fed. R.

Civ. P. 50(b). A motion for judgment as a matter of law following a jury verdict is "a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 365 (5th Cir. 2002). As such, the court is "especially deferential" to the jury's verdict. *Vetter v. McAtee*, 850 F.3d 178, 185 (5th Cir. 2017).

The court does not weigh the evidence or make credibility determinations, which are the province of the jury. *Id.* Instead, in reviewing the evidence, the court "must draw all inferences in favor of the nonmoving party." *Id.* "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id* (citation omitted).

It is the non-moving party's burden to "at least establish a conflict in substantial evidence on each essential element of their claim." *North Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 473 (5th Cir. 2018) (quoting *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1039 (5th Cir. 2011)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id* (quoting *Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 485 (5th Cir. 2017)). The court can only grant a motion for judgment as

a matter of law "if the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable people could not arrive at a contrary verdict." *Vetter*, 850 F.3d at 185.

"A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when [her] conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'" *Delaughter*, 909 F.3d at 136 (quoting *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (per curiam). An Eighth Amendment delay in medical care claim requires a plaintiff to prove that (1) the prison official acted with deliberate indifference and (2) the deliberate indifference resulted in substantial harm. *Delaughter*, 909 F.3d at 136 (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)). In order to prove deliberate indifference, a plaintiff must establish that the prison official (1) knew the inmate "face[d] a substantial risk of serious harm and (2) "disregard[ed] that risk by failing to take reasonable measures to abate it." *Delaughter*, 909 F.3d at 136 (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Perry challenges only the sufficiency of the evidence with regard to the second deliberate indifference element.[4]

   b. <u>Analysis</u>

Under the second element, the Fifth Circuit has held that a plaintiff must show that "prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince

---

[4] Perry conceded the first element – knowledge that Plaintiff faced a substantial risk of harm – at trial, Trial Tr. [236] at 117-18; [237] at 75, as well as in her brief, Mem. [245] at 7.

a wanton disregard for any serious medical needs." *Valentine v. Collier*, 978 F.3d 154, 163 (5th Cir. 2020) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345-46 (5th Cir. 2006)) (internal quotation marks omitted); *accord Gibson v. Collier*, 920 F.3d 212, 219-21 (5th Cir. 2019). The Fifth Circuit has noted that medical treatment that is merely unsuccessful or negligent does not constitute deliberate indifference, "nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (citations omitted).

Here, Plaintiff alleged that Perry failed to take reasonable measures to abate his serious need for hip surgery and post-operative treatment by denying him access to willing outside orthopedic specialists and refusing to pay for the necessary surgery. Perry challenges the sufficiency under both theories. Perry argues that Plaintiff failed at trial to present any competent evidence that she denied him access to willing specialists or refused to pay for the necessary hip surgery. Mem. [245] at 9. The Court addresses each in turn.

### i. Denial of access to outside orthopedic specialists.

On this issue, a sufficient evidentiary basis exists from which a reasonable jury could have concluded that Perry acted with deliberate indifference by denying Plaintiff access to willing outside orthopedic specialists. Perry testified that her duties as the Chief Medical Officer included locating and arranging appointments for inmates, like Plaintiff, with outside specialists, following the initial approval of such requests by the on-site medical director at each prison. Trial. Tr. [236] at 74-75, 77-78. Hatten corroborated this testimony. *See id.* at 41 (testifying Perry's duties included responsibility for all inmate specialty care).

The jury heard and saw evidence that Central Mississippi Correction Facility site director Dr. Robert Moore approved Plaintiff for outside specialty care on March 7, 2010. *Id.* at 80; *see* Pl.'s Ex. 4, at 3. However, the timeline Perry testified to established significant periods between September 2011 and the trial date where Plaintiff was not taken to see any outside specialists at all. For example, following his September 2011 appointment, Plaintiff did not see another outside specialist for almost two years until he returned to Dr. Nipper in September 2013. Trial Tr. [236] at 90. After the 2013 visit, Plaintiff waited more than two years to see another outside specialist. *Id.* at 95-96. Following the March 2016 visit with Dr. Smith, Plaintiff waited another ten months to see an outside specialist. *Id.* at 236. After the January 2017 visit with Dr. Peavy, Plaintiff did not see another outside specialist for more than a year and a half. *Id.* at 105-06; 107. And the evidence indicated that Plaintiff did not see any outside specialists again between July 2019 and September 2021.

The jury also received evidence establishing significant periods where Perry made no attempt to locate willing outside specialists. For instance, other than Dr. Nipper, Perry could not name a single outside specialist contacted between September 2011 and November 2015.[5] Trial Tr. [236] at 121-123. Based on her letter to Dr. Stronach, it also appears that no attempts were made again between April 2016 and January 2017. *See* Def.s' Ex. 4, at 2. And a reasonable jury could have also inferred, despite Perry's contrary assertion, that no attempts were made between Plaintiff's January 2017 visit with Dr. Peavy and his February 2019 visit with Dr.

---

[5] Perry initially responded with the names of several outside specialists but ultimately conceded they were all contacted after 2015. Trial Tr. [236] at 122.

Porter. Based on that evidence, a sufficient evidentiary basis exists from which a reasonable jury could have determined that Perry acted with deliberate indifference by ignoring Plaintiff's need for surgery.

The jury heard other evidence that established, or supported a reasonable inference, that Perry wantonly disregarded Plaintiff's serious need for surgery. For example, Perry testified that Dr. Nipper allegedly cancelled the original surgery without explanation and refused to reschedule it. Trial Tr. [236] at 89-91. Yet, Perry made no efforts to contact any other outside specialists for more than four years. *Id*. at 121-123. The trial record also established that despite Dr. Nipper referring Plaintiff to UMMC in 2013, Joint Ex. 1, at 15, he did not see a UMMC specialist until more than two years later, Joint Ex. 6, at 2.

As another example, Perry testified that the vast majority of attempts to contact outside specialists did not occur until after July 2018, more than eight years after it was determined that he needed the surgery and specialty care was approved. Trial Tr. [236] at 113. The jury also heard evidence that in July 2018 the Fifth Circuit entered an Order appointing appellate counsel, which noted the delay in declaring the intent to provide the surgery and the lack of pursuit of out-of-state options. Order [146] at 1-2. Based on that evidence, a sufficient evidentiary basis existed for a reasonable jury to conclude that Perry did not begin making earnest attempts to locate a willing surgeon until eight years after the surgery was deemed necessary, and only after the Fifth Circuit took notice. [6]

---

[6] While Perry testified that she was not aware of that Order, under this posture, the Court does not lend credence to interested witness testimony or consider evidence that the jury was not required to believe. *Reeves*, 530 U.S. at 152.

14

In a similar vein, the jury heard evidence that Perry waited more than eight years before seeking permission from the MDOC commissioner to pursue out-of-state options. Trial Tr. [236] at 106-07. On this issue, Perry contends that "[b]ecause the decision to go across state lines for medical care is not a power that lies with [her], it is unreasonable and unfair to regard this delay as 'the Chief Medical Officer's failure to pursue out of state options.'" Mem. [245] at 19. Perry may be correct that the decision to permit the pursuit of out-of-state options lies with the commissioner, but by her own admission the decision to request such permission lied with her. Trial. Tr. [236] at 120. Yet, she did not seek that permission for more than eight years. Given Perry's assertion that all in-state options were unwilling to perform the surgery, a reasonable jury could have determined that her decision to not seek permission to pursue out of state options evidenced a wanton disregard for Plaintiff's surgical needs.

On this same issue, the jury also saw evidence that Dr. Naranaje had agreed to perform the surgery before subsequently canceling it based on his belief that specialists at UMMC were already planning to perform it. Joint Ex. 7, at 2-4, 7-8. Yet, Perry testified that Dr. Smith had refused to give Plaintiff a follow-up visit. Trial Tr. [236] at 108. Nonetheless, the evidence establishes that she waited more than sixteen months to write Dr. Naranje and attempt to rectify his mistaken assumption. Def.s' Ex. 9, at 2. Thus, a reasonable jury could have also determined that Perry acted deliberately indifferent to Plaintiff's surgical needs based on this conduct as well.

Therefore, considering all the evidence above under the relevant legal standard, the Court finds that under the totality of the circumstances, a reasonable jury could have had a legally sufficient evidentiary basis to find that Perry acted with deliberate indifference to Plaintiff's serious surgical needs by denying him access to willing outside specialists. *See Nobach v. Woodland Vill. Nursing Ctr., Inc.*, 799 F.3d 374, 377-78 (5th Cir. 2015) (recognizing the applicable legal standard for a Rule 50(b) motion). A reasonable jury could have based that determination of the evidence that Perry denied him access to willing outside specialists, ignored his serious need for surgery, or acted with a wanton disregard towards that need. Each alone is sufficient to establish deliberate indifference. *See Valentine*, 978 F.3d at 163.

> ii.    *Refusal to pay for the necessary hip surgery.*

On this issue, the jury heard and saw two sets of conflicting relevant evidence. On the one hand, the jury saw two original statements from Dr. Nipper. In the first statement, from his medical notes, Dr. Nipper indicated that following their September 2011 visit, he referred Plaintiff for a CT scan and custom component evaluation. Joint Ex. 1, at 15. However, his notes stated that, "[P]lainitff's insurance would not provide for that." *Id.* The second statement came from an August 14, 2015, letter to Plaintiff, in which Dr. Nipper opined that "[u]nfortunately, with the MDOC, I am unable to do the surgery as the required reconstructive devices cannot be paid for at my facility." Pl.'s Ex. 9, at 2.

On the other hand, the jury heard Dr. Nipper's September 2019 deposition testimony regarding these statements, which was read into evidence at trial. Trial Tr. [237] at 60; Def.s' Ex. 10. When asked about his first statement, Dr. Nipper

16

testified that he could not remember exactly what he meant. Def.s' Ex. 10, at 18. He later stated, seemingly referencing the first original statement, that ". . . I mean, I dictated the notes." *Id.* at 25. Dr. Nipper also explained that "[t]here was obviously some concern about it. The custom components are ridiculously, notoriously expense to do a reconstruction like that, so." *Id.* at 40. When asked about his second statement, Dr. Nipper responded that while someone had obviously raised an issue about the costs, he could no longer remember the specifics of the conversation. *Id.* at 25. Dr. Nipper went on to explain that ". . . I don't specifically remember them denying based on the - - So this is - - the letter probably misstates. It proba- - -or is probably not a good way to state it."[7] *Id.* at 26. When asked whether Perry ever refused to pay for the surgery, Dr. Nipper did not explicitly say that she did not, just that he did not remember that. *Id.* at 26.

Based on that evidence alone, Plaintiff has carried his burden of establishing a conflict in substantial evidence on this issue. *See North Cypress Med.*, 898 F.3d at 473 (citing *Goodner*, 650 F.3d at 1039). Nonetheless, Perry offers her own interpretation and weighing of the evidence, and credibility assessments, and essentially asks the Court to interchange her conclusion for the juries. *See* Mem. [245] at 10-12. Under a Rule 50(b) motion, the Court cannot. *Vetter*, 850 F.3d at 185. "Weighing the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury,

---

[7] Perry contends that the evidence establishes that Dr. Nipper was dissuaded from performing the surgery by his own facility, Mem. [245] at 9; however, viewing his deposition testimony under the relevant standard undercuts that argument.

and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275, 1297 (5th Cir. 1988).

Here, competent, and substantial evidence exists to support a determination that Perry acted with deliberate indifference by refusing to pay for Plaintiff's necessary surgery. The jury could have determined that Dr. Nipper's original statements, made at or close to the time of the events, were more accurate than his subsequent recollection years later. The jury could have likewise considered Perry's testimony that inmates, like Plaintiff, do not have insurance and must rely on MDOC to cover such costs. Trial Tr. [236] at 49; 51-52. As well as the medical services portion of the MDOC handbook, which vests the discretion of whether to provide prostheses devices for inmates in the "responsible medical staff." Pl.'s Ex. 8, at 1. And Perry's testimony that as the Chief Medical Officer, she has the final say in approving treatment, Trial Tr. [236] at 77, and that the MDOC authorizes and analyzes claims just as a health insurance company does. *Id.* at 86. Based on that evidence, the jury could have inferred that Perry refused to pay for the necessary treatment.

Therefore, having considered all of the aforementioned evidence under the relevant legal standard, the Court finds that under the totality of the circumstances, a reasonable jury could have had a legally sufficient evidentiary basis to find that Perry acted with deliberate indifference by refusing to pay for Plaintiff's necessary surgery. *See Nobach*, 799 F.3d at 377-78. At a minimum, Plaintiff has established a conflict between Dr. Nipper's original statements and subsequent deposition

18

testimony; thus, precluding granting the renewed motion for judgment as a matter of law on this ground. *See North Cypress Med.*, 898 F.3d at 473.

### iii.   Extraneous Arguments

Before concluding, the Court pauses to address some of the other points raised on this issue. First, Perry suggests that this case presents a "unique" issue of first impression, because she is "completely reliant upon third parties, i.e., private medical care specialists, to provide the specific treatment required." *Id.* at 7-8. Yet, that has no bearing on this case. The issue here was whether Perry's conduct in denying Plaintiff access to willing outside specialists or refusing to pay a willing outside specialist to perform the surgery constituted deliberate indifference.

In support of that argument, Perry cites a litany of cases from the Fifth Circuit, as well as other circuits. Mem. [245] at 8-9. Because her argument essentially offers a straw man fallacy, the Court declines to discuss each case. However, the Court will address the case cited and discussed by both parties, *Austin v. Johnson*, 328 F.3d 204 (5th Cir. 2003). According to Perry, *Austin* is distinguishable. Mem. [268] at 5. It is not.

In *Austin*, the juvenile plaintiff was ordered to attend a one-day boot camp where participants performed various exercises. 328 F.3d at 206. During the afternoon exercises, the plaintiff informed the instructors that he was feeling sick. *Id*. Despite falling several times, he was directed to keep going, before apparently being left behind. *Id* at 210. Sometime after 2:00 p.m., the plaintiff was taken inside, where he began vomiting. *Id*. At 3:00 p.m., the plaintiff "became dehydrated" and fell

unconscious. *Id*. The defendants, however, waited until 4:42 p.m. to call an ambulance. *Id*. As a result, the plaintiff suffered a heat stroke and remained in the hospital for two weeks suffering from acute renal failure, acute hepatitis, and pancreatitis. *Id*. at 206. He later brought suit under §1983 alleging that the defendants were deliberately indifferent to his serious medical needs. *Id*. at 208, 210.

The panel in *Austin* held that "[b]efore 3:00 p.m., defendants' conduct was perhaps only negligent." *Id*. at 210. However, the panel went on to hold that defendants' "failure to call an ambulance for almost two hours while [the plaintiff] lay unconscious and vomiting [rose] to the level of deliberate indifference." *Id*. As the panel noted, "[g]iven the serious medical consequences of dehydration, a reasonable person would not have waited nearly two hours to call an ambulance once [the plaintiff] became unconscious." *Id*.

Similar logic applies in this case. Perry's taking Plaintiff to Dr. Nipper following his initial sick call requests and approval for outside treatment, is analogous to the *Austin* defendants taking the plaintiff inside following his complaints. Thus, the initial delay in taking Plaintiff to an outside specialist following the approval for such care and even some time after Dr. Nipper's cancellation, while Perry was allegedly attempting to have it rescheduled, may only be negligent. However, like the *Austin* defendants, Perry's failure to do anything beyond the initial step moved her conduct from negligence, or even gross negligence, to deliberate indifference. If a two-hour delay in taking more than the initial step constituted

deliberate indifference in *Austin*, then Perry's failure to do anything beyond the initial step here, for multiple years, must also constitute deliberate indifference.

Nor is the Court persuaded that the alleged attempts to reschedule the procedure with Dr. Nipper are enough to remove the conduct from the sphere of deliberate indifference. While Perry testified that she was allegedly attempting to reschedule the appointment, she also testified that Dr. Nipper was refusing to reschedule. Trial Tr. [236] at 121. If true, then Perry's refusal to attempt to locate another willing outside specialist four years certainly rises to the level of deliberate indifference. It is also worth noting that because the jury possessed a legally sufficient evidentiary basis to concluded that Perry's refusal to pay caused the initial cancelation, attempting to reschedule it would not support a conclusion that she did not act with deliberate indifference.

Equally unpersuasive is Perry's argument that "*Austin* would be like the present case if the defendants had called for an ambulance and requested medical aid multiple times, but the ambulance never came." Mem. [268] at 5. That proposition omits that the first and second attempts to seek aid, in this case, were at least two years apart. In the Court's view, *Austin* would be like the present case, if those defendants had moved the plaintiff inside and then waited not just two hours, but two years, to call the ambulance despite knowing the seriousness of the plaintiff's medical condition.

But *Austin* does provide a useful illustration of why the argument that this case is "unique" lacks merit. In *Austin*, the defendants unquestionably had the ability

to call the ambulance, but they did not. Their liability arose from the failure to call the ambulance when it became readily apparent one was necessary. Here, Perry unquestionably had the ability to seek out willing outside specialists, but she did not. Her liability (putting aside the refusal to pay argument) arises from the failure to seek out any willing surgeons for multiple years once it became readily apparent – by her own admission – that Plaintiff required surgery. For that reason, this case is not "unique."

Second, Perry contends that "[t]he reaity of the situation is simply this – prior to trial, MDOC was unable to find an orthopedic surgeon willing to operate on [Plainitff] due to the severity of his condition, the complexity of his cause, his status as a prisoner, and his tobacco and marijuana use." Mem. [245] at 12. Perry presented this interpretation of the evidence to the jury. Plaintiff presented a counter interpretation – Perry did not actually try to find a willing surgeon or refused to pay one that was willing. Based on the jury's verdict it is apparent that they chose to believe Plaintiff's version of events over Perry's. While it is apparent that Perry disagrees with that determination, disagreements with jury verdicts do not warrant overturning them.

On this same point, Perry argues that Plaintiff's "allegations are simply disagreements with the treatment decisions" of the outside specialists. *Id*. at 13. But no such disagreements exist here. Instead, Plaintiff claimed that Perry constrained his ability to obtain the treatment doctors determined he required. The Court also notes that the Fifth Circuit rejected this exact argument from Hatten on appeal.

*Delaughter*, 909 F.3d at 138. As the panel rather explicitly noted, " [ ] claims like [Plaintiff's] do not constitute "mere disagreement with one's medical treatment." *Id*. The same holds true here.

In a similar vein, Perry goes on to argue that this is simply "a classic example of a matter for medical judgment." Mem. [245] at 12. In support, she cites the Fifth Circuit's decision in *Tunstin v. Livingston*, 766 F. App'x 174 (5th Cir. 2019) (unpublished) (per curiam). However, Perry's reliance on *Tunstin* is misplaced.

In *Tunstin*, the original surgery to remove the plaintiff's abscessed tooth was delayed due to his suffering a seizure during transport to the hospital. *Id*. at 178. In this case, as previously explained, a sufficient evidentiary basis existed from which a reasonable jury could have determined that Perry's refusal to pay caused the first cancellation. Additionally, in *Tustin* the plaintiff had at least six appointments with dentists in the year following the original surgery cancellation. *Id*. In this case, Plaintiff did not see an outside specialist again for two years following the original cancellation, or any outside specialists, other than Dr. Nipper, in the first four years. Therefore, the facts in *Tunstin* are clearly distinguishable from the facts in the present case.

Next, Perry spends almost seven pages offering her own interpretation of the evidence to establish that she took reasonable measures to abate Plaintiff's hip issues. Mem. [245] at 13-20. As previously explained, under a renewed motion for judgment as a matter of law, the Court does not engage in that type of re-weighing of the evidence or assessment of witness credibility. *Vetter*, 850 F.3d at 185.

Perry also takes issue with Plaintiff pointing out at trial, as well as the Court's subsequent citation to this fact, that she could offer no corroborative evidence in support of her testimony that she undertook extensive efforts to locate a willing surgeon. Mem. [245] at 17; Mem. [268] at 3. Perry first argues that as the Chief Medical Officer she cannot make entries into inmate medical record. Mem. [245] at 17. At trial, however, Perry did not testify that she could not make such entries, just that she does not. Trial Tr. [236] at 102-03. Perry next argues that it was "misleading" to suggest that she "failed to perform a non-existent duty" to make notations in the medical records. Mem. [245] at 17. In the Court's view, Plaintiff did not suggest Perry failed to fulfill some duty to make such entries; instead, he made the rather elementary point that Perry could not offer any evidence to corroborate her own testimony.

Finally, Perry argues that "[w]hen balancing [her] sworn testimony [ ] outlining the exhaustive efforts to obtain surgery for Plaintiff, with that of Plaintiff's evidence, i.e., the lack of a fictional record of communications, Plaintiff's evidence does not outweigh [hers], such that it is legally sufficient to support the jury's verdict." Mem. [268] at 3. But this "weighing" of evidence is expressly prohibited under a renewed motion or judgment as a matter of law. *Vetter*, 850 F.3d at 185.

c. Conclusion

To prove deliberate indifference, Plaintiff had to establish that Perry disregarded the substantial risk of harm he faced by failing to take reasonable measures to abate it. *Delaughter*, 909 F.3d at 136 (citing *Farmer*, 511 U.S. at 847).

Thus, whether the jury based its deliberate indifference determination on evidence of a denial of access or a refusal to pay, is not the dispositive question. Instead, the question is whether a sufficient evidentiary basis exists to support the jury's determination that Plaintiff proved that element.

Having reviewed all of the evidence above, *in toto*, under the applicable legal standard, the facts and inferences do not "point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict." *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 855 (5th Cir. 2010). The Court finds that there was sufficient substantial evidence to support the jury's verdict on liability, for either reason or both. Accordingly, Perry's Renewed Motion [244] for Judgment as a Matter of Law will be denied.

## B. Alternative Request for a New Trial

In the alternative, Perry asserts two grounds for a new trial: (1) the jury's verdict in favor of Plaintiff is against the weight of evidence, (2) the Court erred by not giving two jury instructions she requested. Mem. [245] at 20. The Court addresses each in turn.

### a. Applicable Legal Standards

Federal Rule of Civil Procedure 50 allows a party to "include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Under Rule 59(a), a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). "A new trial may be granted, for example, if the district

court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985).

"The decision to grant or deny a motion for new trial is a matter for the trial court's discretion; [and the appellate court] will reverse its ruling only for an abuse of discretion." *Seibert v. Jackson Cty.*, 851 F.3d 430, 438 (5th Cir. 2017). This discretion is even broader when the district court denies, rather than grants, such a motion. *Compare Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005) ("Where a motion for a new trial is granted, we scrutinize that decision more closely," because "the broad discretion allowed to the trial court is tempered by the deference due to a jury") (internal quotes and citation omitted), *with Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998) ("It goes without saying that review of the denial of a new trial motion is more limited than when one is granted. The denial will be affirmed unless, on appeal, the party that was the movant in district court makes a clear showing of an absolute absence of evidence to support the jury's verdict, thus indicating that the trial court had abused its discretion in refusing to find the jury's verdict contrary to the great weight of the evidence") (internal quotes and citation omitted).

   b.  <u>Analysis</u>

      i.  *Whether the jury's verdict is against the great weight of evidence.*

Perry first moves for a new trial on the ground that the jury's verdict is against the weight of the evidence. Mot. [244] at 1. As the Fifth Circuit has stated "[a] trial

court should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence." *Whitehead*, 163 F.3d at 269. Under this standard, "the jury's verdict must be 'against the great — not merely the greater — weight of the evidence.'" *Scott v. Monsanto Co.*, 868 F.2d 786, 789 (5th Cir. 1989) (quoting *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 362–63 (5th Cir. 1980)). In other words, the movant must show an absolute absence of evidence to support the jury's verdict." *Whitehead*, 163 F.3d at 269.

To begin with, Perry's Memorandum in support makes little attempt to show an absolute absence of evidence to support the jury's verdict. Mem. [245] at 21-22. In fact, Perry does not argue that the jury's verdict is against the great weight of evidence, just that it is "against the weight of evidence." *Id*. To support that assertion, Perry offers four cursory paragraphs that essentially restate her position that Plaintiff failed at trial to produce "any evidence" to support his delay in medical care claim.[8] *Id*. On the other hand, Perry asserts that her testimony established that the delay was the result of outside specialists exercising medical judgment[9] and that she took reasonable measures to abate Plaintiff's hip issues. *Id*.

Because the Court has already determined that some evidence exists to support the jury's verdict, *see* discussion *supra* Section II.A., this argument lacks merit. At best, Perry has presented a conflict in the evidence, but that is insufficient to warrant a new trial. *See Dawson v. Wal-Mart Stores*, 978 F.2d 205, 209 (5th Cir.

---

[8] It is also worth noting that Perry asserts, without citation or explanation, that "[t]here is an abundance of uncontradicted testimonial evidence provide by defense." Mem. [245] at 21.
[9] As previously noted, the Fifth Circuit rejected this exact argument, based on the same claims, from Hatten on appeal. *See supra* p. 22-23.

1993). Both sides presented their case at trial. It is apparent from the verdict that the jury chose to believe Plaintiff's version of events, and not Perry. While Perry may disagree with that verdict, disagreements do not warrant new trials.

While Perry's Reply essentially reasserts those same arguments it does raise a few additional contentions that the Court will address. Mem. [268] at 6-7. Perry first contends that it was seemingly not possible for the jury to believe that she refused to pay for the surgery. *Id*. Perry asserts that Plaintiff's evidence was "mere speculation," while her testimony established that she never refused to pay, "which directly contradicts Plaintiff's theory." *Id*. at 7.

However, the Court has already undertaken an extensive review of the evidence on this issue. *See supra* pp. 16-19. As that discussion made clear, while there is certainly conflicting evidence, there is not an absolute absence of evidence. Even when reviewed under the new trial standard, without drawing all favorable inferences in Plaintiff's favor, the jury's verdict – if it was based on the refusal to pay –is not against the great weight of the evidence.

To buttress her argument, Perry further asserts that "it was unreasonable for the jury to disregard Dr. Nipper's explicitly and unambiguous testimony" that she never refused to pay. Mem. [268] at 7. For the reasons previously explained, Dr. Nipper's deposition testimony is neither explicit nor unambiguous. *See supra* pp. 16-19. Dr. Nipper exhibited a general inability to accurately recall the details surrounding his original statements. *See* Def.s' Ex. 10, at 18, 25-26, 38.  In fact, Dr. Nipper rather explicitly testified that his recollection may be unreliable. *Id*. at 40.

28

Thus, the evidence lends support to a determination that his original statements were more accurate. Those statements, considered in conjunction with the other evidence previously discussed, *see supra* pp. 16-19, do not support a determination that the jury's verdict is against the great weight of evidence.

Perry next contends that the jury ignored uncontradicted evidence from Dr. Peavy's medical notes that Plaintiff consented to delaying his surgery. Mem. [268] at 8. However, it was Perry's testimony that called into question the credibility of Dr. Peavy's notes. Plaintiff testified that he did not agree to postpone the surgery. Trial Tr. [237] at 18. Perry seemingly corroborated that assertion by testifying that the contents of Dr. Peavy's notes were "inaccurate" and that she did not believe that Plaintiff agreed to postpone the surgery. Trial Tr. [236] at 103. Given that Perry placed the credibility of this evidence into question, it certainly cannot support a determination that the jury's verdict is against the great weight of evidence. And given that both parties discussed this evidence at trial, it does not appear that the jury ignored it.

Finally, Perry contends that the jury ignored undisputed evidence that Plaintiff's marijuana and tobacco use caused more than one surgeon to postpone surgery. Mem. [268] at 7. Perry, however, offers no indication of which specific evidence the jury ignored. Nonetheless, the Court's review of all of the evidence establishes that this issue arose with both Dr. Smith and Dr. Naranje. For clarity's sake, the Court addresses them in reverse chronological order.

With respect to Dr. Naranje, the evidence lends support to the conclusion that Plaintiff's use of tobacco and marijuana did not cause the cancellation of that surgery. Dr. Naranje's notes indicate that Plaintiff had not used either substance in the thirty days preceding their visit. Joint Ex. 7, at 3. No evidence was introduced at trial to suggest that Plaintiff had used either substance in the period prior to that visit. And a review of the MDOC records indicate that Plaintiff had not been found to have used either substance for more than a year preceding his visit with Dr. Naranje. *See* Def.s' Ex. 5, at 4. (indicating that Plaintiff was lasted cited for tobacco use on June 10, 2017).

As for the cancellation, Dr. Naranje provided the following explanation:

> On further reviewing [Plaintiff's] previous records, it was apparent that he was been [sic] treated at University of Mississippi and surgery was planned once he stops smoking and drugs which I agree. It would be in his best interest if he gets surgery in nearby hospital as he is high risk for complications and may need multiple hospital admits. I will refer him further to his previous surgeons at University of Mississippi.

*Id*. at 8. Noticeably, Dr. Naranje's cancellation appears based on the (mistaken) belief that Plaintiff was already being treated at UMMC and that UMMC had already planned the surgery. The only mention of either substance in Dr. Naranje's cancellation is in reference to Dr. Smith's notes. And a review of all of Dr. Naranje's records in evidence provide no support for the idea that he had any independent reason to believe that Plaintiff was currently using either substance.

However, the evidence does support a determination that Perry's wanton disregard for Plaintiff's serious medical needs allowed this mistaken assumption – which caused the surgery's cancellation – to go uncorrected for more than a year and

a half. Perry testified that Dr. Smith had continually refused to provide Plaintiff with a follow up appointment or to agree to proceed with scheduling the surgery. Trial Tr. [236] at 99-100. Despite this knowledge, Perry waited more than a year and a half before attempting to contact Dr. Naranje to correct his mistaken assumption that UMMC (i.e., Dr. Smith) had already scheduled the surgery, or that they actually intended to proceed with it. Def.s' Ex. 9, at 2. Based on the other evidence previously discussed it also appears that Perry made no attempt to correct the mistaken assertion Plaintiff was using tobacco or marijuana.

In sum, the evidence lends supports to the conclusion that the use of marijuana and tobacco did not the cause Dr. Naranje's cancellation. It does however support the conclusion that Perry's deliberate indifference to Plaintiff's need for surgery led her to wait more than a year and half to attempt to correct the mistaken assumptions under which Dr. Naranje cancelled the surgery.

The Court now turns to this issue with regard to Dr. Smith. Dr. Smith first saw Plaintiff on March 8, 2016. Joint Ex. 6, at 2. The records indicate that Plaintiff informed Dr. Smith that he was an occasional smoker but indicated no use of alcohol or illegal drugs. *Id*. During that visit Dr. Smith ordered Plaintiff to undergo a series of lab tests to determine whether his left hip was infected and would first need aspiration before any surgery. *Id*. at 3. As Dr. Smith explained, the results of the labs would determine whether a one-stage or two-stage revision would be required. *Id*. Dr. Smith's notes concluded with "[w]e will get the labs today and have him follow up in two weeks' time." *Id*. At the follow-up visit, on April 5, 2016, the lab results showed

no infection and Plaintiff indicated that he "want[ed] to proceed with surgical intervention." *Id.* at 7. Dr. Smith's notes go on to provide that following that election to proceed he "discussed with him that he needs to be completely drug and nicotine free prior to use proceeding. Will not drug test him today as he openly admits to using marijuana. Will plan to bring him back in 2 months and will drug test him at that time." *Id.*

Plaintiff did not return to see Dr. Smith in two months, or ever again. Trial Tr. [236] at 99, 108. In fact, based on Perry's testimony it appears questionable whether Dr. Smith ever intended to schedule a surgery. Perry testified that her attempts to set up the follow-up visit where refused and that when she attempted to contact Dr. Smith about the issue, he refused to speak with her. *Id.* at 99-100.

For those reasons, the evidence lends supports to the conclusion that the use of marijuana and tobacco did not the cause Dr. Smith to postpone any surgery. It was not until the follow-up visit that Plaintiff was first offered the opportunity to proceed with the surgery or that Dr. Smith indicated a willingness to schedule the surgery. Consequently, Plaintiff could not have caused the postponement of a surgery that was never scheduled or even agreed to until that date. Nor does the evidence indicate that Dr. Smith intended to proceed with the surgery at any sooner date than he might have had Plaintiff not openly admitted to recent marijuana use. And Perry's testimony tends to indicate that Dr. Smith never had any actual intention of scheduling, much less performing, the surgery.

Of course, Perry had the option to call Dr. Smith as a witness and inquire on these issues, but she did not. Thus, the jury, and now the Court, have only the medical records and the party's testimony to consider. Based on that evidence, Plaintiff did not cause the postponement of any surgery by Dr. Smith.

However, the Courts inquiry is not at an end. Under the new trial standard, the Court must consider all of the evidence. *Smith*, 773 F.2d at 613. Thus, if the Court is to consider the evidence of Plaintiff's tobacco and marijuana use, it must also consider Plaintiff's explanation for this use. When asked why he smoked marijuana, Plaintiff responded that "[i]t helps. It's better than anything they give me. It helps me eat and sleep, helps with the pain. It just helps." Trial Tr. [237] at 17. Plaintiff also testified that while his pain was significant in 2010, when he originally began submitting sick calls, by 2015 when he saw Dr. Peavey, it far exceeded any previously experienced pain. Specifically, Plaintiff testified:

> I've had rheumatoid arthritis a long time, and I felt a lot of pain before, but I ain't never felt nothing like that metal bouncing around in there. When it hits your bone, it'll knock you slap out. I have had instances where it will just knock me out, just wake up on the ground. That's how hard it hits you. It's very, very bad pain.

*Id*. at 16. Plaintiff also testified that his hip would "lock up" for periods of time, confining him to a wheelchair, and that the increasing problems in his left hip also resulted in back and right hip problems because of the way he had to walk on it. *Id*. at 22. Plaintiff further testified that he now has to use a cain to put on and take off his pants and socks because he cannot bend over. *Id*. Plaintiff went on to explain that

sometimes he goes without food, and that his medication had been stopped, because he cannot make the "long walk" to the get them. *Id*. at 22-23.

Plaintiff's testimony regarding his pain is also supported by the medical records in evidence. When Plaintiff saw Dr. Nipper in 2011, the acetabular component in his left hip had failed and there was debris present, but scans revealed no fracture. Joint Ex. 1, at 4. By March 2016, Dr. Smith determined that the left hip had totally failed and was now fractured. Joint. Ex. 6, at 2. Dr. Smith noted that "[i]t appears that the [left] stem has migrated proximally through the fracture and the polys. It is causing significant ware. He has almost no offset and is shortened severely." *Id*. Dr. Smith also noted that the right hip had now severely migrated as well. *Id*.

Based on that evidence, the jury may well have determined that Plaintiff's marijuana use was a direct result of Perry's deliberate indifference to his serious, and increasingly worsening, medical condition. After reviewing the evidence, the Court cannot credibly say that there is an absence of evidence to support that determination or that such a determination would be against the great weight of the evidence.

To conclude otherwise, the Court would have to willingly avert its eyes from the circumstances that seemingly lead to Plaintiff's view that marijuana was his best option. By 2016, Plaintiff had already been waiting for surgery for more than five years and would continue to wait over five additional years. In those first five years, Plaintiff's condition had severely worsened. He experienced continually increasing pain and the inability to perform basic tasks like putting on his clothes or walking to get food and medicine. The medication Plaintiff did receive, he claims did not help.

The only person who could assist him in obtaining the treatment seemingly had little interest in doing so. After all, despite Plaintiff's continually submitting sick calls, and Dr. Nipper's alleged refusal to operate, she waited almost four years to contact anyone else. Placed in that position, Plaintiff was left to manage his pain, the best he could, with very limited options. Thus, the Court cannot endorse the underlying implications of Perry's argument; namely, that if an individual's constitutional rights are violated long enough to develop a reason to shift the blame towards them, the person accused of such violation can abscond from liability.

Moreover, even if the medical records offered some scintilla of evidence for the conclusion that tobacco or marijuana use caused a delay in surgery, the Court would be hesitant to adopt the position that Plaintiff should bear fault for engaging in conduct that not only appears to be the result of Perry's deliberately indifferent conduct, but also that he seemingly had no fair notice to avoid. One fundamental principle interwoven throughout the law is the demand of "fair notice" and the opportunity to conform one's behavior to the law's commands. *See Sessions v. Dimaya*, 138 S.Ct. 1204, 1225, 200 L.Ed.2d 549 (2018) (Gorsuch, J., concurring) ("Perhaps the most basic of due process's customary protections is the demand of fair notice") (citing Note, Textualism as Fair Notice, 123 Harv. L. Rev. 542, 543 (2009) ("From the inception of Western culture, fair notice has been recognized as an essential element of the rule of law")); *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 807 (2011) (Alito, J., concurring) ("Due process requires that laws give people of ordinary intelligence fair notice of what is prohibited"); *United States v. Abbate*, 970 F.3d 601,

603-04 (5th Cir. 2020) (per curiam) ("It is a basic principle of due process that a statute may not be "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement")(quoting *Johnson v. United States*, 576 U.S. 591 (2015)). In fact, that principle arises in this case – the law had to be clearly established such that Perry had notice that her conduct violated Plaintiff's Eighth Amendment rights. *See infra* pp. 38-41; *see also Cf. Delaughter*, 909 F.3d at 139-40.

Here, it does not appear that Dr. Smith provided Plaintiff any notice at the original March 2016 visit that he needed to be drug and nicotine free prior to the April 2016 follow-up visit. Joint Ex. 6, at 2-6. If he had, this would be a different story. Instead, it appears that Dr. Smith first provided notice of the proscription of such conduct at the April 2016 follow-up visit and only after the possibility of surgery was first offered. *Id.* at 7. Once provided notice, it appears that Plaintiff complied. The evidence presented appears to support the conclusion that he had not used tobacco or marijuana for at least six months following the April 2016 visit. *See* Def.s' Ex. 5, at 4 (indicating that Plaintiff was not cited for using either product between March 30, 2014, and November 5, 2016).

The only potential notice it appears Plaintiff may have had to avoid the use of tobacco or marijuana came from the surgical information sheet provided prior to his 2011 scheduled surgery with Dr. Nipper. That form stated that individuals must abstain from smoking after midnight the day before surgery. Joint Ex. 3, at 2. While Dr. Smith's notes indicate Plaintiff admitted to "recently" using marijuana, they

make no suggestion that he had used them in the preceding day. Joint Ex. 6, at 7. Nor do MDOC records support such a conclusion. Thus, it appears that Plaintiff complied with the only notice he had regarding such behavior.

For those reasons, even if the medical records could be interpreted differently, the Court is hesitant to the idea that Plaintiff should bear fault for conduct that he had no notice to avoid, especially when that conduct appears to be the direct result of Perry's ongoing violation of his constitutional rights. While the Court is cognizant that the fair notice principle has not explicitly been applied in such circumstances, it appears at least instructive in this case. To conclude that Plaintiff should bear responsibility for engaging in conduct, which he was only provided notice to avoid after that surgery was offered, would appear arbitrary and directly contradict the ideal that individuals should have the opportunity to conform their conduct to known requirements.

In sum, on the whole record, the jury's verdict is not against the great weight of evidence. *Scott*, 868 F.2d at 789. The Court finds that Perry has failed to establish "an absolute absence of evidence to support the jury's verdict." *Whitehead*, 163 F.3d at 269. Accordingly, Perry's alternative request for a new trial will be denied on this ground.

  ii. *Whether the Court erred by denying Perry's two requested jury instructions.*

Perry next asserts that there should be a new trial because the Court erred in denying her two requested jury instructions. Trial courts are afforded "wide latitude in fashioning jury instructions" *Jowers v. Lincoln Elec. Co.,* 617 F.3d 346, 352 (5th

Cir. 2010) (quoting *Bender v. Brumley,* 1 F.3d 271, 276 (5th Cir. 1993)). A trial court's refusal to accept a proposed instruction is reviewed for abuse of discretion, *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 578 (5th Cir. 2004); however, the legal accuracy of a proposed instruction is reviewed de novo, *GE Cap. Com., Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 301 (5th Cir. 2014).The Fifth Circuit has held that the rejection of a proposed instruction constitutes a reversible error only if the requested instruction "1) was a substantially correct statement of the law, 2) was not substantially covered in the charge as a whole, and 3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the [party's] ability to present a given [claim]." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 505 (5th Cir. 2012) (alterations in original).

### 1. Qualified Immunity

Perry contends that the Court erred by denying her requested qualified immunity instruction. Mem. [245] at 22. Perry advances several arguments in support of that contention. None is persuasive.

First, Perry argues that the Fifth Circuit did not definitively hold that she is not entitled to qualified immunity. Mem. [268] at 8. On at least this point, Perry is correct. Perry was not named as a Defendant until this case was remanded. Therefore, it was not possible for the Fifth Circuit to have held that she was not entitled to qualified immunity.

However, that argument ignores that the original claims Plaintiff raised against Hatten are the same claims raised against Perry. In addressing those claims, the Fifth Circuit explicitly held that if the factual issues regarding the reason for the

delay were resolved in Plaintiff's favor "Hatten's conduct would violate clearly established law and he *would not be entitled to qualified immunity.*" *Delaughter*, 909 F.3d at 140. (emphasis added). Because the Fifth Circuit has already explicitly decided the qualified immunity issue on the exact claims raised against her, this Court is bound by that determination under the law of case doctrine, which prohibits a lower court, on remand, from reexamining an issue of fact or law that has been explicitly or implicitly decided on appeal. *See United States v. Matthews,* 312 F.3d 652, 657 (5th Cir. 2002) (quoting *Tollett v. City of Kemah,* 285 F.3d 357, 363 (5th Cir. 2002); *see also Conway v. Chemical Leaman Tank Lines, Inc.,* 644 F.2d 1059, 1062 (5th Cir. 1981). For that reason, a qualified immunity instruction was not warranted.

Second, Perry argues that she lacked fair notice that "the failure to secure appointments for an inmate for outside specialty care, might amount to an unjustified delay in medical care in violation of the constitution" until the *Miles* decision. Mem. [268] at 8. This argument reads the right too narrowly. As the Fifth Circuit explained, "it is not necessary for controlling precedent to have held that the official's exact act was unlawful." *Delaughter*, 909 F.3d at 140 (citing *Brown v. Miller*, 519 F.3d 231, 236-37 (5th Cir. 2008). Instead, "[t]he central concern is whether the official has fair warning that [her] conduct violates a constitutional right." *Delaughter*, 909 F.3d at 140 (internal citations omitted).

On appeal, the Fifth Circuit determined that *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993), combined with the three unpublished decisions[10] cited by

---

[10] *Miles* 576 F. App'x at 396–97; *Rodriguez v. Woods*, No. 98-40231, 1999 WL 197117, at *1 (5th Cir. Mar. 18, 1999); and *Rhett v. Scott*, No. 97-10910, 1998 WL 307736, at *1 (5th Cir. May 21, 1998).

Plaintiff, provided "fair warning that an unjustified delay in surgery is unconstitutional." *Delaughter*, 909 F.3d at 140. Therefore, because the law clearly established that a delay in medical care was unconstitutional in 1993, and the unpublished decisions clearly illustrated that unjustified delays in surgical procedures were unconstitutional as early as 1998, Perry had fair notice at all times relevant to this action. For this reason, a qualified immunity instruction was also not warranted.

Based on the Fifth Circuit's holding, Perry's argument that, as a matter of law, she was entitled to qualified immunity prior to the date of the *Miles* decision, Mem. [245] at 23, is equally unavailing. Contrary to Perry's assertion, the Fifth Circuit did not mention *Miles* to denote when the law became clearly established. Instead, the mention of *Miles* came while reciting the cases Plaintiff had cited in support of his position. *Delaughter*, 909 F.3d at 140.

More noteworthy is that the Fifth Circuit's opinion directly undermines Perry's argument that she is entitled to qualified immunity at least prior to the *Miles* decision. Plaintiff's original claims against Hatten involved conduct dating back to 2011. *Id*. at 138. Noticeably, however, in evaluating this issue the Fifth Circuit did not hold that if the factual issues were resolved in Plaintiff's favor Hatten would not be entitled to qualified immunity on the claims against him, except to the extent those claims involved any conduct prior to the *Miles* decision. *id*. at 140. Instead, as already noted, the Fifth Circuit held that if resolution of the factual issues went in Plaintiff's

favor, Hatten "*would not be entitled to qualified immunity.*" *Delaughter*, 909 F.3d at 140 (emphasis added).

Next, Perry argues that Judge Ho's concurring opinion apparently indicated that qualified immunity should remain a defense on remand. Mem. [245] at 23. Judge Ho's opinion expressed no issue with the majority's qualified immunity analysis. *Delaughter*, 909 F.3d at 141-42 (Ho, J., concurring). Even if it had, "[t]he language in that one-judge opinion, concurring in the majority's judgment but disagreeing with some of its reasoning, is not binding." *Rust v. Bank of America, N.A.*, 573 Fed. App'x. 343, 347 (5th Cir. 2014) (per curiam). Instead, Judge Ho wrote separately to emphasize that the medical records from Dr. Smith and Dr. Peavey should be considered on remand. *Delaughter*, 909 F.3d at 141 (Ho, J., concurring). Those records were presented to the jury at trial and extensively discussed by the parties. And the Court has discussed both throughout this opinion.

In any event, Perry's proposed instruction presents an incorrect statement of law. As relevant here, Perry's instruction provided that:

> Qualified immunity applies if a reasonable official could have believed that an inability to find a surgeon willing to operate on Plaintiff Delaughter's hip was lawful in light of clearly established law and the information Defendant Hatten or Defendant Perry possessed.
>
> . . .
>
> In this case, the clearly established law at the time was that delaying medical care can constitute an Eight Amendment violation if the prison official knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it, and the delay results in substantial harm. Additionally, it was clearly established by July 31, 2014, that Defendant Hatten and Defendant

41

> Perry had fair warning that an unjustified delay in obtaining a surgery
> is unconstitutional.

*See generally* Mem. [245] at 22; *see also* App. A (Defendants' proposed jury instruction). As previously explained, the assertion that the law did not clearly establish that an unjustified delay in surgery was unconstitutional until July 31, 2014, is legally incorrect. Additionally, because *Miles*, is an unpublished opinion, it cannot create "clearly established" law. *See Cooper v. Brown*, 844 F.3d 517, 525 n. 8 (5th Cir. 2016). It is also worth noting the impropriety of including an instruction premised on the "inability to find" a willing surgeon when a portion of the dispute in this case was whether Perry was unable, or did not try, to find a willing surgeon. In the Court's view, including such an instruction would have resulted in a prejudicial error.

Even if Perry had been entitled to such an instruction, the failure to provide one would not warrant a new trial, because the jury charge provided substantially covered this issue. The qualified immunity inquiry consists of two prongs. The first prong asks, "whether the [defendant's] alleged conduct has violated a federal right." *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (en banc), *cert. denied sub nom.*, *Hunter v. Cole*, — U.S. —, 141 S. Ct. 111, 207 L.Ed.2d 1051 (2020). The second prong asks "whether the right in question was 'clearly established' at the time of the alleged violation, such that the [defendant] was on notice of the unlawfulness of his or her conduct." *Id.* As the Fifth Circuit has stated, the second prong presents a "purely legal question." *See Davis v. Hodgkiss*, 11 F.4th 329, 333 (citing *Kinney v.*

*Weaver*, 367 F.3d 337, 341 (5th Cir. 2004) (en banc), *cert. denied sub nom.*, *Green v. Kinney*, 543 U.S. 872 (2004)).

Here, the Court submitted the resolution of the first prong – whether Perry's conduct violated that clearly established law to the jury – to the jury. *See* Trial Tr. [237] at 90. Thus, the jury charge substantially covered the only factual issue implicated under the qualified immunity analysis. Therefore, even if such an instruction should have been included, its absence does not warrant a new trial.

Based on the foregoing, Perry was not entitled to a qualified immunity instruction. The instruction she proposed presented an incorrect statement of law. And even if she were entitled to such an instruction, the jury charge provided substantially covered the only factual issue for jury resolution under the qualified immunity analysis. Accordingly, the request for a new trial on this ground will be denied.

## 2. Respondeat Superior

Perry next contends that the Court erred in denying her request to instruct the jury on the issue of respondeat superior. Mem. [245] at 23; Mem. [268] at 9. Perry argues that, through his testimony, Plaintiff sought to hold her liable as a supervisor or "boss." Mem. [245] at 23. Perry also argues that because Plaintiff allegedly sought to impose supervisory liability without pleading such a claim, a jury instruction was necessary to cure any potential confusion the jury may have had on this issue. *Id.*

In the Court's view, Plaintiff did not seek to impose supervisory liability at trial. During his testimony, Plaintiff used the words "boss" or "bosses" on two separate occasions relevant here:[11]

> Q. Do you have any reason to believe -- because you have sued Dr. Perry in her individual capacity, you are making a claim against her, and you are making a claim against Mike Hatten, not somebody else. Do you have any reason to believe Dr. Perry told Dr. Nipper not to do the surgery on you?
>
> A. They're the bosses, that's what I know. They are the bosses. They are the highest I can go to to get surgery, and that's where I went. I went to them and I still haven't had surgery. Even the doctors will tell you there's a problem, you go to the boss. I can't get you the surgery, go to my boss. I went to the two bosses. I still haven't had surgery.
>
> . . .
>
> Q. Anybody ever tell you Dr. Perry wouldn't pay for your surgery?
>
> A. Dr. Nipper said that MDOC wouldn't pay for it. And all I know is she's the boss, there's no higher up, so...

Trial Tr. [237] at 33-34; 54. Both responses appear to restate Plaintiff's general position through this case – as an inmate, he must rely on Perry to locate, obtain, and pay for necessary surgery, and when he could not get the surgery or was told that his "insurance" would not pay for it, that meant Perry. Thus, it does not appear any supervisory liability was implicated.

Additionally, the Court declines to join Perry's view that a respondeat superior instruction might have cured any supposed confusion over this issue. Mem. [245] at 23. Plaintiff's responses, and arguments throughout the trial, make it clear that he

---

[11] Plaintiff used this language on a third occasion referring to Hatten. Trial Tr. [237] at 53. Because the jury found in Hatten's favor, Final. J. [241] at 1, this reference is not relevant here. Even if it were, the same analysis would apply.

alleged that Perry's conduct alone violated his rights, not someone else. Even if it were not so clear, the suggestion that the aforementioned exchanges may have created some confusion, is undercut by the fact that Perry's counsel prefaced those exchanges by stating in no uncertain terms that Plaintiff's claim was against Perry alone and "not somebody else," and Plaintiff did not disagree with that. Trial Tr. [237] at 33.

Even if some confusion may have arisen, the jury instructions and verdict form laid it to rest. The jury instructions provided that a prison official "violates the Eighth Amendment *if his or her conduct* demonstrated deliberate indifference to a prisoner's serious medical needs." Trial Tr. [237] at 90 (emphasis added). The instructions also provided that Plaintiff bore the burden of establishing that Perry "displayed deliberate indifference to that risk by denying or delaying Plaintiff['s] [] hip replacement, reconstructive surgery, and related treatment." *Id*. The instructions further required Plaintiff to prove that "[ ] *Perry's deliberate indifference* resulted in substantial harm. . . ." *Id* (emphasis added). In a similar vein, the verdict form asked the jury "[h]as [Plaintiff] proven by a preponderance of the evidence *that [Perry] was deliberately indifferent* to his serious medical needs in violation of the Eighth Amendment, resulting in substantial harm." Jury Verdict [23] at 1 (emphasis added). Noticeably, both leave no wiggle room for the idea that anyone's conduct, other than Perry's, was sufficient for Plaintiff to establish his claim. And given that Plaintiff did not assert a supervisory liability claim in this matter, the inclusion of Perry's requested instruction would likely have created the confusion she sought to avoid.

45

Equally unavailing is Perry's attempt to recharacterize Plaintiff's case theory into a narrow argument regarding rescheduled appointments and absent records. Mem. [268] at 9. Plaintiff certainly raised those issues at trial, but even a cursory review of the record establishes that they do not represent the majority of his argument. Nor is the Court persuaded by Perry's attempt to employ her recharacterization to imply that Plaintiff cannot present his case without implicating a supervisory liability issue. Mem. [268] at 9. Plaintiff's rather straightforward contention was that Perry's own conduct violated his Eighth Amendment rights. Perry cannot duck that argument by inventing her own version of Plaintiff's claims so that she can subsequently rebut them.

It is also worth noting the credibility issues prompted by that argument. Here, were having engaged in communications with outside specialists, is not advantageous to her position, Perry contends that "[t]he four staff members of the OMC place these calls to outside medical care providers – not [her]." Mem. [268] at 9. On the other hand, when having engaged in such communications was advantageous to her position, Perry contended that she personally attempted to contact the various outside specialists. Mem. [245] at 18-19. Perry cannot have it both ways.

Yet, in many ways, this is similar to Perry's posture at trial. Perry asserted that she undertook great efforts when the discussion focused on the steps taken to obtain Plaintiff's surgery. *See* Trial Tr. [236] at 121-23. But when the conversation turned to the extended periods where Plaintiff's surgical needs were ignored or wantonly disregard, Perry quickly pivoted to blaming everyone else, calling anyone

who contradicted her position a liar. *Id*. at 92, 108, 136. It is this type of argument, however, that diminishes the credibility of Perry's testimony.

Based on the foregoing, a respondeat superior instruction was not warranted. No supervisory liability claim was asserted or suggested in this case. No confusion on the existence of such a claim existed. If it did, Perry's counsel, the jury charge and verdict form cured it. And the requested jury instruction would likely have created confusion where none previously existed. Therefore, a new trial is not warranted on this ground.

In sum, Perry has failed to establish that the Court abused its discretion in denying her requested instructions. Considering the jury instructions as a whole, the Court possesses neither substantial nor ineradicable doubts that the jury was properly guided in its deliberations. *Pelt v. U.S. Bank Trust Nat. Ass'n,* 359 F.3d 764, 767 (5th Cir.2004) (emphasis added; citing *Johnson v. Sawyer,* 120 F.3d 1307, 1315 (5th Cir.1997)). Accordingly, the request for a new trial on this ground will be denied.

## C.  Alternative Request for Remittitur

As a final request, Perry seeks a remittitur on the ground that the jury's compensatory damages award is excessive. Mem. [245] at 23-28; Mem. [268] at 10. According to her, it is excessive because Plaintiff failed at trial to prove the deliberate indifference element of his delay in medical care claim. *Id*. at 25. Therefore, Perry contends that the Court should remit the jury's compensatory damages award of $382,000.00 to nominal damages. Mem. [245] at 25; Mem. [268] at 10. In the

alternative, Perry contends that the Court should reduce the award to an amount not to exceed $250,000.00. Mem. [245] at 25; Mem. [268] at 10.

a. Applicable Legal Standards

There is a strong presumption in favor of affirming a jury award of damages. The damage award may be overturned only upon a clear showing of excessiveness or upon a showing that the jury was influenced by passion or prejudice. *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1241 (5th Cir. 1985). In determining whether a jury's compensatory damages award is excessive, the Fifth Circuit employs the "maximum recovery rule," *Puga v. RCX Sol., Inc.*, 922 F.3d 285, 297 (5th Cir. 2019), which provides that a court should "decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction," *id* (quoting *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002)). For purposes of the Maximum Recovery Rule, the relevant jurisdiction for a federal question case arising under 28 U.S.C. §1983, is the Court of Appeals for the Fifth Circuit. *See Cf. Salinas v. O'Neil*, 286 F.3d 827, 831 (5th Cir. 2002) (holding "[t]he 'relevant jurisdiction' for federal discrimination law can only mean cases decided by this court."). The decision to grant or deny a motion for new trial or remittitur rests in the sound discretion of the trial judge; that exercise of discretion can be set aside only upon a clear showing of abuse. *Westbrook,* 754 F.2d at 1241.

b. Analysis

Perry's request for the Court to remit the jury's compensatory damages award to nominal damages is essentially a challenge to the sufficiency of the evidence

supporting the jury's damages award rather than an argument that the award was excessive. *See Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 363-64 (5th Cir. 2019).[12] A "sufficiency challenge asks only whether there is any evidence for a jury's award; if there is, the judge's job is at an end." *Id.* at 364. Because the Court has already determined that a sufficient evidentiary basis exists to support the jury's determination, *see* discussion *supra* Section II.A., and as a natural consequence, the award, this challenge is rejected.

The Court now turns to Perry's alternative request to remit the jury's compensatory damages award to an amount not to exceed $250,000.00. In support, Perry directs the Court's attention to *Berry v. Auto-Owners Insurance Company*, a Fifth Circuit decision affirming a remittitur of the jury's compensatory damages award in an automobile accident case. 634 F. App'x 960, 963 (5th Cir. 2015). In her view, *Berry*, though factually inapposite, establishes that Plaintiff's award should not exceed $250,000.00, and even that would apparently be excessive. *Id*.

First, for the Maximum Recovery Rule to apply, the jury's award must be "disproportionate to at least one factually similar case from the relevant jurisdiction." *Puga*, 922 F.3d at 297. By Perry's own admission, there are not any factually similar Fifth Circuit decisions. Mem. [245] at 25; Mem. [268] at 10. Therefore, the Maximum Recovery Rule does not apply in this case.

---

[12] Perry concedes this point, arguing that a remittitur to nominal damages is warranted because the jury lacked a "legally sufficient evidently basis" to determine that she acted with deliberate indifference. Mem. [268] at 10.

Second, under the Maximum Recovery Rule, courts only "looks to other *published decisions* from the relevant jurisdiction." *Longoria*, 932 F.3d at 365 (emphasis added)*; see also Underwood v. Miss. Dept. of Corrections*, Civ. No. 1:18-cv-24, 2022 WL 950872, at * 10 (S.D. Miss. Mar. 29, 2022) (applying the rule). Because *Berry* is an unpublished decision, even if it were factually analogous, it could not be considered as the basis for remittitur.[13]

Additionally, Perry's remittitur argument based on *Berry* possesses at least two substantive flaws. Mem. [245] at 25. As an initial matter, contrary to Perry's assertion, the district court did not reduce the damages award for past and present pain and suffering from $400,000.00 to $250,000.00. Mem. [245] at 25. Instead, it reduced the general damages from $900,000.00 ($600,000 for pain and suffering, $300,000 for loss of enjoyment of life) to $400,000.000 ($250,000 for pain and suffering, $150,000 for loss of enjoyment of life). *Berry*, 634 Fed. App'x at 963. Perry offers no explanation, or authority, to support her unilateral decision to disregard the loss of enjoyment portion of the general damages award. And other district courts in this Circuit have found the inclusion of damages for loss of enjoyment of life permissible in § 1983 cases. *See Chacon v. Copeland*, 103 F.Supp.3d 827, 838-39 (W.D. Tx. April 30, 2015). Thus, even if *Berry* were applicable, it would not support an argument that $250,000.00 should be the maximum recovery allowed.

The other fundamental flaw in Perry's argument is the assertion that even $250,000.00 would be excessive because Plaintiff suffers from a pre-existing

---

[13] Because *Berry* cannot properly be considered here, the Court declines to extensively discuss the lack of factual similarity.

condition. Mem. [245] at 26. This assertion defies the rule that common law tort principles govern compensatory damages in §1983 cases. *Keyes v. Lauga,* 635 F.2d 330, 336 (5th Cir. 1981). One of those principles is the "eggshell skull" rule, under which a defendant must take the plaintiff as she finds him and remains fully liable despite the existence of a pre-existing condition that made the consequences of the wrongful act more severe than they would have been for a normal victim. *See Koch v. United States*, 857 F.3d 267, 273 (5th Cir. 2017); *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018) (applying the eggshell skull rule in the § 1983 context). Therefore, Plaintiff's pre-existing condition serves as no basis to remit the jury's damages award.

Finally, the Court notes that it appears to be an unsettled question as to whether the Maximum Recovery Rule applies at the outset to determine whether damages are excessive or after the excessiveness determination to determine how much of a remittitur is warranted. *See Longoria*, 932 F.3d at 365 (internal citations omitted). Because of this uncertainty, the Court will undertake a separate analysis to determine whether the jury's compensatory damages award is excessive in light of the evidence in this case. Mem. [245] at 25; Mem. [258] at 10.

A verdict is excessive if it is "contrary to right reason" or "entirely disproportionate to the injury sustained." *Caldarera v. Eastern Airlines, Inc.,* 705 F.2d 778, 784 (5th Cir. 1983). While pain and suffering is not easily susceptible to monetary quantification, and the jury has broad leeway, "the sky is simply not the limit for jury verdicts, even those that have been once reviewed." *Simeon v. T. Smith*

& *Son, Inc.,* 852 F.2d 1421, 1427 (5th Cir. 1988). The size of the award a plaintiff is entitled to is generally a question of fact, and the reviewing court should be "exceedingly hesitant" to overturn the decision of the primary fact finder – the jury. *Foradori v. Harris*, 523 F.3d 477, 504 (5th Cir. 2008) (quoting *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 934 (5th Cir. 1982).

Based on the previous extensive discussion of the evidence in this case, *see* discussion *supra* Sections II.A.b,II.B.i., the Court's finds that the jury's compensatory damages award of $382,000.00 is neither contrary to the right reason nor entirely disproportionate to the injury sustained. Here, Plaintiff's constitutional rights were violated for more than a decade, and that violation resulted in substantial pain and suffering. Because the quantification of the injury properly belongs to the jury, *Foradori,* 523 F.3d at 504,   the Court will not disturb it. Accordingly, Perry's alternative request for a remittitur will be denied.

### III. MOTION TO ALTER OR AMEND JUDGMENT

Official capacity Defendant Dr. Donald Faucett[14] ("Defendant") filed a separate Motion [246] to Alter or Amend the Final Judgment [241] granting Plaintiff's request for prospective injunctive relief. The Motion has been fully briefed. For the reasons that follow, the Court will deny the Motion.

---

[14] Because Faucett's substitution as the official capacity defendant in this matter is procedural, and the conduct at issue largely not attributable to him, the Court uses "Defendant" throughout this section to avoid any confusion.

**A.     Relevant Legal Authority**

A motion to alter or amend a judgment under Rule 59(e) of the Federal Rules of Civil Procedure "calls into question the correctness of a judgment." *Templet v. Hydrochem, Inc.*, 367 F.3d 473, 478 (5th Cir. 2004). A Rule 59(e) motion is an "extraordinary remedy" that should be used "sparingly." *Templet*, 367 F.3d at 479, 483. Courts have "considerable discretion" to grant or to deny a Rule 59(e) motion. *Id.* And a court's decision on a Rule 59(e) motion is reviewed only for abuse of discretion. *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990).

To prevail on a Rule 59(e) motion, the moving party must show (1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) a manifest error of law or fact. *See Schiller v. Physicians Resource Group, Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). A Rule 59(e) motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of final judgment. *Templet*, 367 F.3d at 478 (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). Such a motion "cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Id.* Nor may a Rule 59(e) motion "be used to argue a case under a new legal theory." *Simon*, 891 F.2d at 1159 (quoting *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1996)).

**B.     Analysis**

Defendant raises three contentions in support of his request to alter or amend the final judgment: (1) newly discovered evidence renders Plaintiff's prospective

injunctive relief request moot; (2) the *Ex parte Young* exception to sovereign immunity does not apply to Plaintiff's claims against him; (3) Plaintiff is not entitled to prospective injunctive relief. Mem. [247] at 3-6. The Court addresses each in turn.

a. <u>Whether newly discovered evidence renders Plaintiff's prospective injunct-ive relief request moot.</u>

A court will only grant a motion to alter or amend based on the alleged discovery of new evidence when "(1) the facts discovered are of such a nature that they would probably change the outcome; (2) the facts alleged are actually newly discovered and could not have been discovered earlier by proper diligence; and (3) the facts are not merely cumulative or impeaching." *Torrest v. Livingston*, 972 F.3d 660, 663 (5th Cir. 2020) (quoting *Ferraro v. Liberty Mut. Fire Ins. Co.*, 796 F.3d 529, 534 (5th Cir. 2015)).

Here, Defendant contends that newly discovered evidence that Plaintiff has now undergone the first stage of both hip revisions renders his request for prospective injunctive relief moot. Mem. [247] at 3-4; Mem. [267] at 2-6. While Plaintiff's having undergone the first stage of his right hip revision may technically constitute new evidence, it is not "actually" new evidence. The Court had informal notice of this fact before the entry of final judgment and explicitly considered it in determining whether to grant prospective injunctive relief. Mem. Op. & Order [240] at 11-12.

On the other hand, Plaintiff's having undergone the first stage of his left hip revision does constitute actual new evidence. In fact, that evidence did not actually come into existence until Defendant filed his fourth status report on June 23, 2022. *See* Status Report [270] at 3-4. Therefore, while the first stage of the left hip revision

may constitute an actual newly discovered fact, the first stage of the right hip revision does not.

However, even if both qualified as new evidence, neither fact renders Plaintiff's request for injunctive relief moot. A request for injunctive relief "becomes moot when the event sought to be enjoined takes place." *Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998). By Defendant's own admission, Plaintiff sought injunctive relief in the form of an order directing him to obtain, coordinate, and provide Plaintiff's "total hip revision" and "post-surgical treatment." Mem. [247] at 3-4; *see also* Mem. Op. & Order [240] at 12. Again, by Defendant's own admission, only half of the first event has taken place, and as a natural consequence, none of the second event. Because the events sought to be enjoined have not taken place, Plaintiff's request for injunctive relief is not moot.

Additionally, contrary to Defendant's assertion, implementing a treatment plan does not automatically moot the injunctive relief request. Mem. [267] at 4-6. It is well-settled that "a case does not necessarily become moot when a defendant voluntarily ceases the objectionable conduct." *Texas v. Equal Employment Opportunity Commission*, 933 F.3d 433, 449 (5th Cir. 2019) (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)). This is because "[t]he defendant is free to return to his old ways." *W.T. Grant Co.*, 345 U.S. at 632. To establish mootness, Defendant bears the heavy burden of showing that "there is no reasonable expectation that the wrong will be repeated." *Id.* at 633.

In the Court's view, Defendant cannot carry that heavy burden. While the treatment plan and progression of the surgical process are certainly promising, they do not outweigh the concern generated by the rather ominous history in this case. For example, as previously noted, it appears that it took the Fifth Circuit taking notice of this case, and the lackluster attention paid to Plaintiff's serious medical needs, to prompt earnest efforts to locate a willing surgeon.[15] And the argument that the treatment plan prevents Defendant from failing to take Plaintiff to the subsequent revisions or follow-up treatments, Mem. [267] at 6, rings particularly hollow given that no one seemingly had a problem withholding him from treatment for years at a time.[16] For those reasons alone, the Court cannot say that no reasonable expectation can exist of recurring wrongs absent the injunctive oversight.

In rejecting the argument that the treatment plan is sufficient, the Court has also considered the unique circumstances that this case presents. Unlike a non-incarcerated individual, Plaintiff cannot simply schedule or transport himself to his own appointments or procedures. Instead, he must rely on Defendant to make those appointments and to ensure that he is taken to them. Therefore, while the existence of a treatment plan may be enough under ordinary circumstances, where a non-incarcerated individual bears responsibility for making and attending their own appointments, it is not here. Accordingly, this also weighs in favor of maintaining the injunctive relief.

---

[15] While the former official capacity defendant argued that the increased attempts and the appointment of counsel were merely coincidental, Trial Tr. [236] at 113, the Court is not inclined to find that suggestion credible.

[16] The Court addresses Defendant's argument regarding the *Dauzat* case *infra* p. 71.

Moreover, the propensity for dilatory conduct, absent oversight, demands that the injunctive relief remain in place pending the completion of all necessary treatment. As just one example, Defendant's May 18, 2022, status report indicated that the left hip revision was set to be performed in the coming days. Status Report [254] at 3. Defendant's June 2, 2022, status report represented to the Court that he had no update to provide since his previous report. Status Report [269] at 4. In his Reply – filed on the same day – Defendant argued that the Court should moot the injunctive relief request based on new evidence that Plaintiff had now also undergone the first stage of his left hip revision. Mem. [267] at 3. Yet, such evidence was not actually presented until Defendant's June 23, 2022, status report, weeks after he filed that Reply. This gives the Court continued concern that all of the steps necessary to remedy the constitutional violation will occur in an orderly fashion absent oversight. For this additional reason, the Court finds the injunctive relief must remain.

In sum, Plaintiff's having undergone the first stage of each hip revision do not render his requested prospective injunctive relief moot. The injunctive relief directs Defendant to obtain, arrange, and provide both the necessary surgery and post-operative treatment. Half of the first, and none of the second have occurred. Therefore, the relief requested has not been provided. Accordingly, the Court will deny Defendant's request to alter or amend the grant of prospective injunctive relief on this ground.

b.  <u>Whether the Court committed a clear error of law in determining that the</u> <u>*Ex parte Young* exception to sovereign immunity applies to Defendant.</u>

Defendant next contends that it was a manifest error of law to apply the *Ex parte Young* exception to sovereign immunity to the claims against him. Mem. [247] at 4. Specifically, Defendant argues that the Court erred because Plaintiff failed at trial to prove the existence of an ongoing violation of federal law and "some connection" between him and the constitutional violation. *Id*. at 4-5; Mem. [267] at 6-12.

As an initial matter, it appears that Defendant's argument rests on the mistaken assumption that his own conduct is the sole focus of this inquiry. It is not. Defendant automatically replaced Perry, as the official capacity defendant in this matter, upon succeeding her as the Chief Medical Officer, pursuant to Federal Rule of Civil Procedure 25(d). As the advisory committee notes confirm, Rule 25(d) is "merely a procedural device for substituting a successor for a past officeholder." Fed. R. Civ. P. 25(d) advisory committee's note (1961 amendment). Importantly, this Rule "does not affect any substantive issues which may be involved in the action." *Id*. Therefore, the Court does not simply disregard all of the conduct attributable to the former official capacity defendant. If it did, there would exist little incentive not to continually change officeholders to evade constitutional scrutiny.

The more serious problem, however, is that Defendant's arguments are fundamentally improper. The *Ex parte Young* exception analysis is limited to a "straightforward inquiry" into the *complaint's allegations*, not the merits of the claims. *See Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp*., 851 F.3d

507, 519 (5th Cir. 2017) (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). Yet, the premise of Defendant's entire argument on this issue is that Plaintiff failed "at trial" to establish the *Ex parte Young* exception's applicability. *See* Mem. [247] at 4; *see also* Mem. [267] at 9. Therefore, Defendant's argument is intrinsically without merit.

Before turning to the actual merits, it is also worth noting that the Fifth Circuit has already spoken on this issue. On appeal, the Fifth Circuit determined that Plaintiff's original complaint satisfied the straightforward inquiry. *Delaughter*, 909 F.3d at 137. Because the amended complaint raises the same claims and seeks the same prospective relief as the original complaint, the Court is bound to that determination under the law of case doctrine. *Matthews*, 312 F.3d at 657 (quoting *Tollett*, 285 F.3d at 363).

Putting aside those issues, Defendants argument fails on the merits. In determining the applicability of the *Ex parte Young* exception to sovereign immunity, courts follow the two-step analysis employed by the Fifth Circuit. *See City of Austin v. Paxton,* 943 F.3d 993, 998 (5th Cir. 2019); *see also Air Evac.*, 851 F.3d at 519. At the first step, courts conduct a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *City of Austin*, 943 F.3d at 998 (quoting *Verizon*, 535 U.S. at 645). At the second step, court looks to "whether the official in question has a "sufficient connection [to] the enforcement" of the challenged act." *City of Austin*, 943 F.3d at 998

Turning to the first step, Plaintiff's amended complaint alleged an ongoing violation of federal law and sought prospective injunctive relief. Am. Compl. [162] at 7-8. Plaintiff claimed that defendants were violating his Eighth Amendment rights by delaying or denying his receipt of the required hip surgery and post-operative treatment. *Id.* In relief, Plaintiff requested an order requiring them to obtain and arrange that surgery and post-operative treatment. *Id.* Therefore, Plaintiff satisfied the first step.

Under the second step, the Court must determine – while remaining cognizant of the "[Supreme] Court's admonition that *Ex parte Young* presents a "straightforward inquiry" into the complaint's claims" – whether Defendant possessed the requisite connection to the constitutional violation. *Air Evac*, 851 F.3d at 519 (internal citations omitted). In order "[f]or the exception to apply, the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party.'" *City of Austin*, 943 F.3d at 997 (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

Here, as Chief Medical Officer, Defendant possesses the authority to authorize outside specialty care for inmates, like Plaintiff, the authority to approve payment for such care, and the responsibility to find willing outside specialists and arrange the necessary treatment.[17] Those allegations alone tend to undermine any conclusion that Defendant has been named merely as a representative of the state. Nonetheless,

---

[17] Defendant conceded these points in his brief, Mem. [247] at 5, as did the former official capacity defendant at trial, Trial Tr. [236] at 74-75, 77, 86-87.

by virtue of the specific duties of his office alone, Defendant has "some connection" to the delay or denial of Plaintiff's care under the plain language of *Ex parte Young*.

Additionally, Defendant's alleged deliberately indifferent conduct also establishes "some connection." In the Fifth Circuit, what constitutes a sufficient connection remains unsettled; however, one point of agreement is that "some connection" to the enforcement "typically involves compulsion or constraint." *City of Austin*. 943 at 1000 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). Between the alleged refusal to pay and the delay in attempting to locate willing surgeons, Defendant effectively constrained Plaintiff's ability to obtain the necessary hip surgery. Therefore, Plaintiff satisfied the second step of the *Ex parte Young* inquiry.

It is also worth noting that the law requires a showing of "compulsion *or* constraint," *City of Austin*, 943 F.3d at 997 (emphasis added). Because Plaintiff made a sufficient showing of "constraint," it is unnecessary to address Defendant's compulsion argument, the merits of which the Court has already rejected numerous times. As the *Air Evac* panel explained, actions that constrained the plaintiff are sufficient to apply the *Ex parte Young* exception under the Fifth Circuit's *K.P.* holding. *Air Evac*, 851 F.3d at 519. Because Plaintiff satisfied both step of the analysis, the *Ex parte Young* exception to sovereign immunity correctly applies.

To overcome that determination, Defendant offers several additional arguments. None is persuasive.

First, Defendant argues that the "case law requires a higher showing of enforcement" than Plaintiff has made. Mem. [267] at 7. No authority follows that cursory proposition. Noticeably, on appeal the Fifth Circuit did not find that such a higher showing was required. *See Delaughter*, 909 F.3d at 137. Instead, the Fifth Circuit held that only the "straightforward inquiry" into the complaint applied. *Id*. And the cases cited in support of that holding specifically rejected an approach that would go beyond the threshold inquiry in *Coeur d'Alene* and reaffirmed the principle that only a "straightforward inquiry" was required. *See Verizon Md., Inc.*, 535 U.S. at 645; *Air Evac*, 851 F.3d at 515-16.

Second, Defendant directs the Court's attention to five cases[18] which in his view establish that the Fifth Circuit has previously rejected Plaintiff's supposed position – that a state official defendant's general powers, duty, or authority is sufficient connection under *Ex parte Young* to authorize an Eleventh Amendment exception. Mem. [267] at 8. As an initial matter, Plaintiff asserted that Defendant's specific duties to facilitate outside specialty care for inmates created the connection, not some generalized duty.

However, a more fundamental problem is that the cases cited do not support Defendant's position. In *Okpalobi,* the lead opinion endorsed a requirement that the state official in question be "specially charged with the duty to enforce the statute" and "be threatening to exercise that duty." *Okpalobi*, 244 F.3d at 414-15. However, that portion of the opinion – which Defendant cites – did not receive majority support.

---

[18] *City of Austin*, 943 F.3d at 1001, *Air Evac*, 851 F.3d at 519, *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014), *K.P.*, 627 F.3d at 124, *Okpalobi v. Foster*, 244 F.3d 405, 417 (5th Cir. 2001).

*See id.* at 429 (Higginbotham, J., concurring); *id.* at 432-33 (Benavides, J., concurring in part and dissenting in part); *id.* at 441 (Parker, J., dissenting). Subsequently, the panels in *K.P.*, 627 F.3d at 124, and *Air Evac*, 851 F.3d at 519, rejected that "special relation" standard. Thus, only *Morris* and *City of Austin* remain.

In *Morris*, the panel held that "[t]he required "connection" is not 'merely the general duty to see that the laws of the state are implemented,' but 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Morris*, 739 F.3d at 746. In that case, the panel determined that the Texas governor's broad duty to uphold the law did not create a sufficient connection to a statute requiring inmates to pay a health services fee. *Id.* at 745-46. Importantly, the statute at issue specifically tasked the Texas Department of Criminal Justice with its enforcement. *Id.*

But *Morris* is markedly different than the present case. Here, Perry's position as Chief Medical Officer and the associated duties are not analogous to those of the Texas governor. Instead, her duties are analogous to the more specific duties the Texas Department of Criminal Justice had under the statute. There, the Texas Department of Criminal Justice, which the *Morris* panel noted was the correct defendant, was specifically charged with enforcing of the inmate health payment program. *Morris*, 739 F.3d at 745-46. Here, Perry, based on her role as Chief Medical Officer, is specifically charged with locating and effectuating the provision of outside specialty care to inmate. Thus, *Morris* is inapposite.

63

In *City of Austin*, the panel joined those in *K.P.* and *Air Evac*, in declining to incorporate *Okpalobi's* special relation requirement. *See City of Austin*, 943 F.3d at 999-1000. Instead, the panel found that the Texas attorney general was not subject to the *Ex parte Young* exception because Fifth Circuit precedent "requires a higher showing of "enforcement" than the City has proffered here." *Id.* at 1000. In that case, the Plaintiff sought to impose a connection between the attorney general and the ordinance at issue based on his past intervention in similar suits. *Id.* at 1001-0002. The panel held that a propensity for past intervention based on the supremacy of state law over an ordinance in question failed to "demonstrate that there is "a significant possibility" that the Attorney General" would do so again in this particular case. *Id.* at 1003.

However, the facts in this case are distinguishable. While *Austin* involved future potential conduct, this case involved active constraint on Plaintiff's ability to obtain the necessary surgery. And as the *City of Austin* panel opined "[i]mportantly, the *Air Evac* panel noted that direct enforcement of the challenged law was not required: actions that constrained the plaintiffs were sufficient to apply the *Young* exception to the Air Evac officials under this court's *K.P.* holding." *Id.* at 1001. The same logic applies here. Therefore, the connection here is sufficient even under *City of Austin*.

It is also worth noting that the cases cited by Defendant arise in a different context that the present case. In all five cases, the Fifth Circuit examined the connection between a state officer(s) and the enforcement of allegedly

unconstitutional state laws or ordinances. *See City of Austin*, 943 F.3d at 1001 (Texas attorney general's connection to the enforcement of a state housing ordinance); *Air Evac*, 851 F.3d at 510-13 (Texas Commissioner of Insurance and Commissioner of Workers' Compensations' connection to the enforcement of a state workers' compensation statute); *Morris*, 739 F.3d at 74 (Texas governor's connection to the enforcement of a state inmate health care services fee statute); *K.P.*, 627 F.3d at 119 (Louisiana Patients' Compensation Fund Oversight Board's connection to the enforcement of a statute that removed the medical malpractice cap for abortion providers); *Okpalobi*, 244 F.3d at 409-11 (Louisiana governor and attorney generals' connection to the same statute in *K.P.*).

But Defendant has not cited any cases examining a state official's connection to the violation of a specific individuals constitutional rights where the Fifth Circuit adopted his view that some greater "connection" is required. While it does not appear that the Fifth Circuit has had many occasions to address this specific issue, it did have at least one recent opportunity the Court is aware of. In *Planned Parenthood Gulf Coast, Incorporated v. Phillips*, the a panel reviewed a patient-plaintiff's claims that a Louisiana statute that prohibited the provision of taxpayer funds to abortion providers such as Planned Parenthood violated her First and Fourteenth Amendment rights. 24 F.4th 442, 450-51 (5th Cir. 2022). Noticeably, the *Phillips* panel – similar to the panel in this case – held that the *Ex parte Young* exception analysis required only a straightforward inquiry into the complaint and did not impose the additional onerous requirements Defendant seek to in this case. *Id*. at 451-52.

On a different tack, the Article III standing doctrine analysis also supports the determination that the *Ex parte Young* exception applies. The federal standing analysis and *Ex parte Young* analysis "significantly overlap." *City of Austin*, 943 F.3d at 1002 (quoting *Air Evac.*, 851 F.3d at 520). "Federal standing has three well-known requirements: (1) injury-in-fact; (2) 'fairly traceable' causation; and (3) redressability. *Air Evac.*, 851 F.3d at 513 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As the *City of Austin* panel noted, "[i]n fact, it may be the case that an official's 'connection to [ ] enforcement' is satisfied when standing has been established." 943 F.3d at 1002 (quoting *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015)). The panel went on to explain, "[t]hat is, because it's been determined that an official can act, and there's a significant possibility that he or she will act to harm a plaintiff, the official has engaged in enough "compulsion or constraint" to apply the *Young* exception." *City of Austin*, 943 F.3d at 1002.

Here, Plaintiff's amended complaint satisfies all three standing requirements. Under the first element, the injury-in-fact must be "concrete and particularized" and "actual and imminent." *Lujan*, 504 U.S. at 560. Plaintiff alleged that Defendant was deliberately indifferent to his need for necessary hip surgery, resulting in excruciating pain and further hip deterioration. Am. Compl. [162] at 7-9. The delay or denial of necessary medical care violates the Eighth Amendment's prohibition on cruel and unusual punishment. *See Easter*, 467 F.3d at 463; *see also Mendoza*, 989 F.2d at 195. Therefore, refusing to pay for the necessary treatment or delaying the

treatment by failing to seek out a willing surgeon establishes an actual and particularized injury-in-fact.

Under the second requirement, there must be a "fairly traceable" causal connection "between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. As the Chief Medical Officer, Defendant has a duty to find a willing surgeon and arrange the necessary treatment. Inmates, like Plaintiff, cannot make their own appointments but must rely on the Chief Medical Officer. *See supra* p. 18. Therefore, because the delay in arranging the treatment or refusal to pay effectively foreclosed Plaintiff's ability to obtain it, Defendant's conduct is fairly traceable to Plaintiff's injury.

Under the final requirement, the Court must be able to provide relief to redress Plaintiff's injury. *Lujan*, 504 U.S. at 560. Plaintiff must show a "favorable decision will relieve a discrete injury to himself," but not necessarily "that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original). Here, an injunction requiring Defendant to provide the necessary hip surgery and post-operative treatment would cure the "discrete injury" caused by Defendant's deliberately indifferent conduct. Because all three requirements are satisfied, the standing inquiry supports the *Ex parte Young* determination.

Nonetheless, Defendant continues to take issue with the Court's conclusion that because Defendant is the "link between [Plaintiff] and outside specialists," he therefore has "some connection" and authority to compel the provision of surgery . . .

" Mem. [247] at 5. Noticeably omitted is the remainder of the Court's determination: "because he is the one responsible for finding a willing surgeon and coordinating treatment." Mem. Op. & Order [240] at 6. As the entire sentence makes clear, the connection exists based on Defendant's responsibility for effectuating the provision of surgery, not the actual performing of the surgery.

According to Defendant that conclusion constitutes a manifest error of law because "[t]he Court overlooks the fact that, although [Defendant] is responsible for finding a willing surgeon and coordinating treatment, he cannot compel a surgeon to even see [Plaintiff] as a patient, much less perform surgery." Mem. [247] at 5; *see also* Mem. [267] at 8. But why Defendant continues to persist with this straw man fallacy is perplexing; for whether he can "compel" a surgeon to operate is patently irrelevant to this case. And it is certainly not relevant to the *Ex parte Young* exception inquiry. As previously explained, Fifth Circuit precedent requires a showing – in the complaint – of "compulsion or constraint," not both. *City of Austin*, 943 F.3d at 1002. Plaintiff's amended complaint asserted that Defendants failure to seek out willing surgeons and refusal to pay constrained his ability to obtain the necessary medical care. *See supra* p. 66. That is enough under the *Ex parte Young* exception inquiry. Thus, while the need to repeat this extraneous proposition is apparently "not lost on him," Mem. [267] at 8, what does appear lost is an understanding of the issue in this case.

In sum, Plaintiff's amended complaint satisfied both steps of the Fifth Circuit's analysis to determine the *Ex parte Young* exception's applicability. The federal

standing analysis also supports that determination. As does the Fifth Circuit's opinion. *Delaughter*, 909 F.3d at 137. Therefore, the Court finds no clear error of law. Accordingly, the Court will deny Defendant's request to alter or amend the grant of prospective injunctive relief on this ground also.

     c.  <u>Whether the Court committed a clear error of law by determining Plaintiff is entitled to prospective injunctive relief.</u>

Defendant finally contends that even if the *Ex parte Young* exception applies, the Court committed a clear error of law by granting the requested prospective injunctive relief. Specifically, Defendant argues that Plaintiff is not entitled to such relief because he failed at trial to prove the deliberate indifference element of his delay in medical care claim. [19] Mem. [247] at 5.

The Supreme Court has determined that appropriate injunctive relief may be granted where a prisoner proves the required elements of his deliberate indifference claim. *Farmer v. Brennan*, 511 U.S. 825, 846-67 (1994). The Prison Litigation Reform Act ("PLRA") empowers federal courts to grant prospective relief in cases such as this one, if the court finds "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right [of a particular plaintiff], and is the least intrusive means necessary to correct the violation of the Federal right." *See* 18 U.S.C. § 3626 (a)(1).

Here, a unanimous jury determined that Plaintiff proved the deliberate indifference and all other elements of his delay in medical care claim. Jury Verdict

---

[19] Defendant's attempt to masquerade his disagreement with the outcome of this case as a clear error of law is not well taken. Mere disagreement does not equal the existence of a clear error of law.

[230] at 1; Final J. [241] at 1. A sufficient evidentiary basis supports that determination. *See* discussion *supra* Section II.A. As previously determined, the injunctive relief comports with the PLRA's narrow tailoring requirements. *See* Mem. Op. & Order [240] at 11-12. Because Defendant makes only passing reference to those requirements, and offers no specific objections, *see* Mem. [267] at 11, the Court sees no reason to re-litigating that issue.

Defendant also contends, in a manner similar to his mootness argument, that Plaintiff is not entitled to prospective injunctive relief because no ongoing constitutional violation exists. Mem. [247] at 4. Specifically, Defendant suggests that because Plaintiff has undergone the first stage of each hip revision, it cannot be said that a constitutional violation remains ongoing. For the reasons explained above and the reasons that follow, that argument lacks merit.

The Eighth Amendment's prohibition against cruel and unusual punishment to "imposes a duty on prison officials to 'ensure that inmates received adequate . . . medical care.'" *Easter*, 467 F.3d at 463 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 832). A prison official violates that right when "his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'" *Id*. (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

Here, adequate medical care meant providing the required hip surgery and post-operative treatment. The constitutional violation arose from the Defendant's deliberately indifferent conduct towards obtaining and facilitating that care. Given that by his own admission, only half of the former has occurred, Mem. [267] at 7, and

as a natural consequence, none of the latter, Plaintiff's medical needs have not been completely satisfied. Therefore, the constitutional violation has not been cured.

On this issue, contrary to Defendant's assertion, the Court finds the Eastern District of Louisiana's decision in *Dauzat v. Carter* persuasive. Civ. No. 14-0239, 2015 WL 2066472 (E.D. La. Apr. 30, 2015), *aff'd*, 670 F. App'x. 297 (5th Cir. 2016) (unpublished). In that case, as here, the requested relief sought the completion of all medically necessary care, not simply its initiation.  *Id*. at *14. The district court held that:

> If the initiation of care suffced, the defendants would be free to take Dauzat for one visit with the surgeon and physical therapist without taking him to the necessary follow-ups that address his medical needs. This would not only create the potential of repetition of the constitutional violation, but it would evade review without providing Dauzat with the appropriate relief.

*Id*. On appeal, the Fifth Circuit affirmed, finding that the treatment that doctors had determined necessary and ordered had not been completed. 670 F. App'x at 298. Importantly, the Fifth Circuit noted that the plaintiff had alleged facts indicating that the defendants acted with deliberate indifference and that the treatment was not received until after the district court entered an order. *Id*.

Here, Plaintiff has not merely alleged facts indicating Defendant acted with deliberate indifference. A unanimous jury determined, and sufficient evidence supports, that Defendant acted with deliberate indifference. Like *Dauzat*, the necessary treatment did not actually initiate until after that decision and has not been completed. Thus, the Court finds *Dauzat* supports the determination that the constitutional violation remains ongoing.

Accordingly under the PLRA, "[p]rospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right," and complies with the other aforementioned requirements. § 3626(b)(3). Because the constitutional violation remains ongoing the injunctive relief will not be terminated. And because the evidence established multiple instances where a lack of oversight led to Plaintiff's serious medical needs being ignored and dilatory efforts to obtain that treatment, the Court finds it necessary for the prospective relief to remain intact. As for the scope of the relief, it extends no further than necessary to ensure the completion of all necessary treatment, is narrowly drawn to ensure that treatment is obtained and facilitated, and is constructed in the least intrusive means to ensure the complete remedy of the constitutional violation. *See* Mem. Op. & Order [240] at 11-12. Upon the successful completion of all necessary treatment, Defendant may move to terminate the prospective relief.

In sum, Plaintiff satisfied the requirements for entitlement to prospective injunctive relief. The Court granted that relief in accordance with the PLRA's requirements. Because the constitutional violation has not been cured, termination of that relief is not warranted. Thus, no clear error of law exists. Therefore, the Court will deny Defendant's request to alter or amend the grant of prospective injunctive relief on this ground as well.

## IV. <u>CONCLUSION</u>

To the extent the Court has not addressed any of the parties' remaining arguments, it has considered them and determined they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Renewed Motion [244] for Judgment as a Matter of Law or, in the Alternative, a New Trial, filed by Defendant Gloria Perry is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the Motion [246] to Alter or Amend Judgment filed by Defendant Donald Faucett is **DENIED**.

**SO ORDERED AND ADJUDGED**, this the 6th day of July 2022.

*s/ Robert H. Walker*

ROBERT H. WALKER
UNITED STATES MAGISTRATE JUDGE